Ninth Circuit No. 16-30174
_____

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DAVID LEE FRY,

Defendant-Appellant.

U.S. Court of Appeals
No. 16-30174

U.S. District Court
No. 3:16-CR-00051-13-BR
(Oregon)

APPELLANT'S EXCERPT OF RECORD
_____

On Circuit Rule 9-1.1 Appeal from the United States District Court
District of Oregon
Honorable Anna J. Brown (trial judge)
Honorable Robert e. Jones (judge on release decisions)
_____

Per C. Olson, OSB #933863
Hoevet Olson Howes, PC
  1000 S.W. Broadway, Suite 1500
  Portland, OR 97205
  Telephone: (503) 228-0497
*Attorney for Appellant*
_____

# EXCERPT OF RECORD
## INDEX

Order (07/13/2016, CR 878) .......................................................... ER-1

Transcript of 07/13/2016 Detention Hearing (CR 922) ................................. ER-3

Defendant's Motion for Reopen Detention Hearing
(06/21/2016, CR 751) ................................................................ ER-26

Supplemental Findings Regarding Defendant's Motion to Revoke
Detention Order (04/04/2016, CR 414) ............................................... ER-30

Transcript of 04/04/2016 Detention Hearing (CR ___) ................................ ER-31

Order of Detention After Hearing (03/04/2016, CR 241) ............................. ER-67

Transcript of 03/04/2016 Continued Detention Hearing (CR 383) ..................... ER-68

Defendant's Motion for Release From Detention
(03/04/2016, CR 239) ................................................................ ER-88

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 3:16-cr-00051-BR-13 |
| v. | ) | |
| | ) | |
| DAVID LEE FRY, | ) | ORDER |
| | ) | |
| _____Defendants._____ | ) | |

JONES, District Judge,

This matter came before the court for hearing on defendant David Lee Fry's Motion to Reopen Detention Hearing [# 751] pursuant to 18 U.S.C. § 3142(f). Defendant appeared with counsel and presented new information that, in his view, justified revisiting his pretrial detention. First, he correctly noted that the court has dismissed Count 3 of the Indictment and that he is no longer charged with a crime of violence. As a result of the dismissal, the rebuttable presumption under 18 U.S.C. § 3142(e)(3)(B) no longer applies. Second, defendant indicated that he is no longer subject to a term of probation in Ohio. Third, defendant noted that plea agreements of codefendants suggest that his potential sentence if convicted may be exceeded by his pretrial detention. Fourth, he states that codefendants with equally as serious conduct have been released.

-1-   ORDER

I find that this new information and defendant's argument do not overcome the findings and reasoning in Judge Beckerman's order of March 4, 2016 [# 241], in my earlier rulings [## 364 and 414], in my findings during the present hearing, and in the Pre Trial Services's strong recommendation to continue detention. As noted previously in those findings, defendant Fry left Ohio without permission while on probation which demonstrates an unwillingness or inability to comply with release conditions. The record also reflects that defendant Fry has threatened "suicide by cop" and exhibited volatility and unpredictability making him a risk of danger to himself and others when under stress. Accordingly, I find by clear and convincing evidence that no conditions of release will reasonably assure defendant Fry's appearance at trial or the safety of the community. Accordingly, defendant's motion [# 751]is DENIED.

IT IS SO ORDERED.
DATED this ____ day of July, 2016.

Robert E. Jones
United States District Judge

-2-    ORDER

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF OREGON

 3   UNITED STATES OF AMERICA,      )

 4              Plaintiff,          )   No. 3:16-cr-00051-BR-13

 5        v.                        )

 6   DAVID LEE FRY,                 )   July 13, 2016

 7              Defendant.          )   Portland, Oregon

 8

 9

10

11

12

13

14

15                      Detention Hearing

16                 TRANSCRIPT OF PROCEEDINGS

17            BEFORE THE HONORABLE ROBERT E. JONES

18         UNITED STATES DISTRICT COURT SENIOR JUDGE

19

20

21

22

23

24

25
```

```
 1
 2                            APPEARANCES
 3
 4    FOR THE PLAINTIFF:      Mr. Ethan D. Knight
                             Mr. Craig J. Gabriel
 5                           United States Attorney's Office
                             1000 S.W. Third Avenue, Suite 600
 6                           Portland, OR 97204
 7
 8
 9    FOR THE DEFENDANT:      Mr. Per C. Olson
                             Hoevet Olson Howes, PC
10                           1000 S.W. Broadway, Suite 1500
                             Portland, OR 97205
11
12
13    COURT REPORTER:        Bonita J. Shumway, CSR, RMR, CRR
                             United States District Courthouse
14                           1000 S.W. Third Ave., Room 301
                             Portland, OR  97204
15                           (503) 326-8188
16
17
18
19
20
21
22
23
24
25
```

| | |
|---|---|
| 1 | (P R O C E E D I N G S) |
| 2 | THE COURT:  Good morning, everybody.  Have a seat, |
| 3 | please. |
| 4 | MR. KNIGHT:  Good morning, Your Honor.  We're present |
| 5 | in the matter of United States v. David Fry.  This is |
| 6 | Case No. 16-cr-00051.  Ethan Knight and Craig Gabriel appearing |
| 7 | on behalf of the United States.  Mr. Fry is present, in |
| 8 | custody, with counsel, Per Olson, and we're here today, Your |
| 9 | Honor, on Mr. Fry's motion for reconsideration of his prior |
| 10 | detention order. |
| 11 | THE COURT:  Thank you. |
| 12 | Counsel. |
| 13 | MR. OLSON:  Good morning, Your Honor.  Per Olson -- |
| 14 | THE COURT:  Good morning. |
| 15 | MR. OLSON:  -- here with Mr. Fry this morning.  We're |
| 16 | ready to proceed. |
| 17 | And I'll just launch into it, if I may.  When we were |
| 18 | here back in April last on this motion, there was a count in |
| 19 | the indictment, the superceding indictment, that was then |
| 20 | considered a crime of violence.  That count has been dismissed |
| 21 | from the indictment, and that has significance on today's |
| 22 | hearing because the burden has shifted. |
| 23 | I should say back then there was a rebuttable |
| 24 | presumption that there would be no conditions or combination of |
| 25 | conditions that would reasonably assure the appearance of the |

1   defendant or the safety of the community or other persons, but

2   that rebuttable presumption is no longer in effect as a result

3   of Count 3 being removed from the case.  There are no other

4   counts in the indictment that the defendant is charged with

5   that are crimes of violence, would be considered crimes of

6   violence.

7           So what we have is -- it's the government's burden to

8   prove by a preponderance of the evidence that the defendant is

9   a flight risk and that there's no conditions that can

10  ameliorate that, and the government must prove by clear and

11  convincing evidence that he's a danger to the community or

12  others, and there's no conditions that can ameliorate that.

13          And as the Court is aware from the *Motamedi* decision

14  cited in this circuit many years ago, it's only in rare

15  circumstances that a release should be denied, and all doubts

16  resolved in the defendant's favor.

17          And it's our position, Your Honor, that Mr. Fry is a

18  good risk for release and that any doubt that the Court would

19  have, particularly regarding his mental health status, should

20  be resolved in his favor.

21          Now, I did provide to the Court this morning an

22  update on his mental health status as provided by the Justice

23  Center.

24          THE COURT:  I have received it.

25          MR. OLSON:  Okay, great.  Thank you, Your Honor.

1       And I'll touch on that in a moment, but I also wanted

2    to briefly mention that I confirmed yesterday that Mr. Fry is

3    not on probation any longer in the state of Ohio.  That was a

4    concern I know the Court had.  Obviously, he did leave the

5    state of Ohio at a time when he was on probation, and that was

6    in violation of his probation.  But I just want to point out

7    that the Ohio authorities have not taken that so seriously as

8    to extend his probation or to put a warrant out for his arrest.

9    They simply terminated his probation.

10       The other thing that's new, I guess, Your Honor, is

11   that since we were last here -- and I mentioned this in my

12   motion to reopen this hearing -- is that a number of people

13   have been released by Your Honor, and included in that list are

14   people who were there at the refuge to the last, including Sean

15   Anderson, his wife Sandy Anderson, and Jeff Banta.

16       And Your Honor may recall from the hearing, the

17   contested hearing on Sean Anderson back in early May, the

18   government made the point of saying that Sean Anderson made

19   some very explicit threats about -- you know, towards the end

20   there, that if people want to come help us, if the FBI tries to

21   stop you, just shoot and kill them.  He made very explicit

22   threats of violence.

23       And I want to point out that Mr. Fry did not make

24   such explicit threats of violence.  He made some statements

25   that were, I would say, more along the lines of suicide by cop

1   sort of thing, but his statements were qualitatively and
2   quantitatively different from the sorts of statement that
3   Mr. Anderson made -- not to trouble him too much here, but I'm
4   just wanting to compare those two situations and point out that
5   Mr. Fry's behavior -- and I've spent a lot of the last few days
6   going through all these live streaming videos that Mr. Fry
7   himself put up on his YouTube website toward those last few
8   weeks that he was at the refuge.  And by and large, Mr. Fry is
9   sort of in the background.  At times he does say things, but
10  he's really not the one who is most vocal in terms of making
11  those sort of provocative statements.

12          Now, I touched on the issue in my memorandum about
13  plea deals that other fellows in this case are striking with
14  the government, and to the point of showing that Mr. Fry's
15  exposure here is not particularly great.  I don't want to dwell
16  on that too much because I don't know what sentence he might
17  get if he's to be convicted.  But this is -- the point is, I
18  guess, that there's a maximum here of six years on Count 1,
19  five years on Count 2.  The guideline range is fairly lenient,
20  as federal cases go, and so there is no upside for Mr. Fry to
21  flee.  He wants to -- he wants -- he still wants to go to trial
22  in September, and that's going to be true regardless of what
23  happens here today, Your Honor, and get this behind him.  So
24  there's not a tremendous risk in terms of what he's facing,
25  calculating what the risk is of flight.

1    Regarding his mental health status, Your Honor, again
2  I did provide this.  I wanted to update the Court regarding his
3  status and the fact that he's doing well.  He's stable,
4  emotionally stable.

5    And he's not taking -- he's not being asked to take,
6  he's not being required to take any sort of psychotropic
7  medication.  That's been an issue that we've discussed in the
8  past.  Mr. Fry has stated that he doesn't want to take those
9  medications because of the side effects, and it remains true
10  today that he is not diagnosed with any condition that would
11  require that, there is no requirement that he take such
12  medication, and therefore I think that is also an indicator of
13  where he is mentally.

14    Your Honor, when we last appeared before you, you
15  issued supplemental findings, mentioning a couple of things,
16  including the fact the defendant had previously been admitted
17  to a mental health facility from which he escaped by breaking
18  down a door.  That was something that happened, I think, about
19  four or five years ago.

20    I want to state, Your Honor -- and I think this comes
21  across in Dr. Guyton's psychological evaluation -- that he did
22  that for a very specific reason, and he did that because he was
23  at that point being told that he was going to be compelled to
24  take psychotropic medication, and he didn't want to do that, so
25  he left that facility.

1      He was soon apprehended, within a matter of hours,

2  and taken to a different facility, where he stayed for a couple

3  of days, and at that facility he was not required to take those

4  psychotropic medications and he was released within a matter of

5  days.

6      And so that did happen.  It was a criminal

7  mischief-type charge that resulted -- as a result of the

8  exiting of the facility, but he has had no other -- that type

9  of mental health commitment since that time period.

10      And so -- and as Dr. Guyton also discerned, he has no

11  mental health diagnosis that by its very nature impedes his

12  ability to be supervised.  He had received a diagnosis early on

13  from that first facility of schizophrenia, but Dr. Guyton, from

14  her analysis, thought that was just a provisional diagnosis,

15  one that likely does not stick and it has not stuck over time.

16  And so he doesn't have that sort of diagnosis that would

17  prohibit him, just by its very nature, from complying with

18  pretrial supervision.

19      So the plan would be, Your Honor, would be

20  essentially as we laid out before, with this addition, and that

21  would be Mr. Fry's father, who was here last time, if the Court

22  were to order his release, Mr. Fry would come back out here

23  from Ohio, escort Mr. Fry, his son, back to Ohio, and there

24  would be a process obviously where he'd get hooked up with

25  pretrial services in Ohio, fitted with an electronic bracelet,

1   and he would be essentially on home detention, with limited

2   purposes where he could leave the premises.

3          And -- now, when trial begins again here in

4   September, he would obviously be required to return, escorted

5   by his father, and he would simply turn himself back in to

6   custody and be in custody, because we don't have any other

7   friends or family members here who could put him up during the

8   trial, but he would simply return to custody at the Justice

9   Center.

10         And in the meanwhile, obviously, he would be

11  preparing for trial with my assistance.  We would be

12  communicating electronically and through the mail between now

13  and the trial date and providing him with electronic media and

14  so on to prepare for trial.  And there's some other business

15  that he wants to take care of while he's out of custody there

16  in Ohio.

17         But that's essentially it, and, Your Honor, we've --

18  we submitted in our first submission a number of support

19  letters.  It's clear, I don't think it's disputed at all that

20  he has tremendous support in the community there in Ohio,

21  friends, loved ones, neighbors who can support him and see him

22  through this process.

23         And as Dr.  Guyton, you know, stated in her

24  psychological evaluation, he does well when there aren't

25  stressors around.  So if he's at home and he's focusing on what

1  he needs to do to prepare for trial, I anticipate there aren't

2  going to be those sorts of stressors, and he will simply come

3  back and have his day in court, his trial.

4         So that's our proposal, Your Honor.  And I feel,

5  based on, you know, just seeing the other gentlemen and the

6  other women in this case who have been released, I feel like

7  I've been semi-inadequate in putting Mr. Fry's situation before

8  the Court.  He does not have pending charges in Nevada, so

9  that's not an issue whatsoever.  There's no risk of being

10  exposed to Nevada jurisdiction.

11         So we simply ask that he be allowed to prepare for

12  trial out of custody.  Thank you.

13         THE COURT:  Thank you.

14         Do you want to be heard?

15         MR. KNIGHT:  Please, Your Honor.

16         Your Honor, as the Court is aware, this is the third

17  time this defendant has come before the Court seeking release,

18  and at this stage, the government's recommendation, consistent

19  with pretrial services' recommendation, remains that he be

20  detained as both a flight risk and a danger to the community.

21         Let me address, if I may, Your Honor, where counsel

22  left off, and that is comparing this defendant to some of the

23  others who have come before the Court.

24         As the Court is aware, this defendant seems to

25  possess a unique set of behaviors or characteristics that make

1  him more volatile, but more importantly, more unpredictable

2  than some of the other defendants who come before the Court.

3  And that really has been the basis of the government's argument

4  and its concern from the outset, at the first hearing on

5  March 4th, the second hearing before this Court in April, and

6  now today, and that is that this defendant simply is too

7  volatile or unpredictable to have any sort of conditions in

8  place to ensure his appearance.

9  And let me go to an example that counsel gave that

10  really, I think, underscores this fact. He gave the example of

11  the defendant's situation where he broke free from a mental

12  health facility because he did not want to take the ordered

13  medication. And that's precisely the point. He may have had a

14  reason for doing that, but he didn't follow directions because

15  he wanted to do things his own way in an unpredictable manner.

16  And that really underscores what we're dealing with here.

17  There's simply no conditions that can ensure his appearance.

18  Your Honor, there are four points counsel made in his

19  motion to the Court prior to this hearing. I'll briefly

20  address those for the Court.

21  The first related to Count 3, the crime of violence

22  issue and the presumption. Again, the government's argument

23  has never really been underpinned primarily by the crime of

24  violence and the presumption. Rather, our position has been

25  all along that we meet our burden because this defendant has a

1    history and there are characteristics attendant to him that are

2    unique and unpredictable that make him a flight risk.

3         The second point on that is, Your Honor, the first

4    hearing where Judge Beckerman ordered his detention occurred

5    prior to Count 3 being charged, and that was on March 4.

6         The second point raised in counsel's motion dealt

7    with the expiring probation in Ohio.  I'll only say that seems

8    to be a reason that detention should be continued today,

9    because we no longer have that backstop with the Ohio probation

10   in place to ensure appearance.

11        Third, counsel raises in his motion the fact that the

12   presumptive sentence may indeed be shorter than what we're

13   looking at for pretrial detention.  At a purely basic level,

14   Your Honor, what counsel is recommending is that this defendant

15   be out of custody for seven weeks -- trial starts in roughly

16   seven weeks -- and then go back in custody.  That's all the

17   time we're talking about.  It seems like an order that would

18   release this defendant for that time carries with it too much

19   risk, given the short time before trial, weighed against any

20   potential sentence.

21        Finally -- and this is the last point counsel made,

22   and it's an important point in his brief -- and that is

23   comparing this defendant to the other defendants who have been

24   released in this case.

25        Again, the government's position gets back to the

1  unique characteristics of the defendant before this Court and

2  his statements, while violent, and however counsel wants to

3  characterize them, do underscore with this history that has

4  been given to the Court with potential mental health issues, a

5  volatility that I think is laid out in the pretrial services

6  report that means there are simply no conditions to ensure by

7  any standard that he will come back before the trial court on

8  September 7th to begin trial when he needs to be there.

9          So based on that and the record that has already been

10 made before this Court, before Judge Beckerman, and the facts

11 contained in the pretrial services report, the government more

12 than meets its burden.  And most importantly, we believe

13 there's evidence to show that any release order in this case

14 would jeopardize the public, and also there would be no way to

15 ensure he'd come back for trial.

16          Thank you.

17          THE COURT:  How do you respond?

18          MR. OLSON:  Briefly, Your Honor, on the issue of

19 unpredictability.

20          So Mr. Fry's -- what's being characterized as

21 volatile statements in this case occurred after a very

22 significant event.  And I know we've talked about this before,

23 but the shooting of LaVoy Finicum.  And in those live stream

24 videos that we see after that event, Mr. Fry and the others are

25 describing how they had heard this as being a man shot with his

1  hands up, on his hands and knees, that sort of situation,

2  fearing that the FBI was now going to come in and do the same

3  to them.

4  So that's the situation that Mr. Fry was in then, and

5  it's been similar situations in the past; that is, under

6  tremendous stress, and where he has reacted to that tremendous

7  stress and it's gotten him in trouble.

8  So what we're proposing is that he go home, that he

9  stay home, that he be on electronic monitoring so that if he

10  leaves the premises to go anywhere else, somebody immediately

11  knows about it; that he not be placed in situations where

12  something like that might occur again.

13  So there are conditions that can control this.  There

14  are conditions that can ameliorate this type of situation the

15  government is talking about, that unpredictability.

16  And I'll tell you, Your Honor, Mr. Fry -- in court

17  there's been some defendants who have spoken out, acted out in

18  various ways in the courtroom.  Mr. Fry has not done that.  He

19  is a very mild-mannered individual and -- when he's not placed

20  under those sort of stressors.

21  And sometimes I get criticized of -- I don't want to

22  say too much about my own personal knowledge of him, Your

23  Honor, but I'll tell you, he is the easiest client I have right

24  now to work with, in terms of meeting with him and discussing

25  the issues involved in the case, and he's probably the least

1   volatile client I've had in a long time.

2          Now, take that for what it is, because I'm an

3   advocate for him, obviously, but this idea that he is -- that

4   he is completely unpredictable in all situations of life simply

5   is not accurate for who this man is.

6          And so he can be supervised, and he has been.  You

7   know, he's had some problems on supervision, but he is capable

8   of reporting to his pretrial services officer and doing those

9   things that are expected of him.

10          THE COURT:  The last time we had a hearing, I had

11   recessed the court and then he wanted to say something further.

12   I was unaware of that.

13          Did you want to make any further statement?

14          MR. OLSON:  He's telling me he wants to -- I'm sorry,

15   Your Honor.

16          THE COURT:  If he wants to make any further statement

17   at this time, he's welcome to do so.

18          THE DEFENDANT:  Yes, thank you.

19          Well, as far as, you know, the issue with me escaping

20   from a mental hospital, you know, when the medical doctor was

21   here and when she gave her statement and stuff like that, you

22   know, she specifically said that, you know, it wasn't -- it's

23   not correct to diagnose someone in one hour, let alone even a

24   day.  It's not long enough.  And so I wasn't comfortable with

25   taking the medications, and I felt that it was actually almost

1  like mal -- you know, malpractice, because simply refusing to

2  take the medications is grounds for forcing medications.  There

3  was no conflicts, there was no confrontations, no arguments,

4  and that was her reason.

5          So I felt like it was necessary for me to leave

6  there, because I had no other choice.  They weren't letting me

7  go.  And so you asked -- as soon as I got to the other

8  hospital, it was perfectly fine.  They properly, you know,

9  diagnosed me with nothing.  They said, you know, there's

10  nothing wrong with him.

11          And so, you know, anybody that goes under the stress

12  in life, it's not because they're mentally ill.

13          And, you know, another thing he says, you know, the

14  seven weeks is a long -- it's not that long, but people are

15  getting bailed because court is in two weeks.

16          And I'd like to go see my pets.  One of my dogs, you

17  know, he's reaching his age, he's 15 years old and he's now

18  having some trouble with him.  I really worry that this would

19  be the last chance to go see him if you did release me.  And so

20  I hope that you take that into consideration.

21          And I have absolutely no problem with coming back.  I

22  absolutely would like to go to court with this.  This is a very

23  interesting case, and I want people to understand that.  And so

24  I have absolutely -- there's no worry about flight risk.  I

25  give you my word I will be here, and to see this through.

```
1              THE COURT:   Thank you.

2              In respect to this matter -- You may have a seat.

3              There are troubling factors that have not been

4    mentioned.   I want to make sure that I have an accurate

5    representation of the facts.

6              The psychological report revealed that the defendant

7    wanted to die by suicide by cop, in quotes, and that he was

8    prepared to die, and that he wanted to die so that he could be

9    reincarnated as a woman, and that he's also very concerned

10   about invasion from outer space, and that he has concerns about

11   a lot of things, nuclear releases and so forth.

12             The situation of this person, with the mental history

13   that he has, which is obvious, it's not deniable that he has a

14   severe mental history.   He's been turned in as a mental issue

15   by his own father.   He has been depressed.   He is manic.   He

16   has had all of these psychological issues, and yet here he is

17   at the refuge with an assault rifle around his shoulder,

18   marching about, walking about with it.

19             He obtained that rifle from his father.

20             THE DEFENDANT:   No, that's not true.   It was left

21   there.   My dad did not bring a rifle there.   I didn't even

22   bring a rifle there.   You're making accusations, sir.

23             THE COURT:   I asked -- I said I'd like to make sure I

24   have the facts right, and I'm willing to listen to you.

25             Where did you get the rifle?
```

```
 1          THE DEFENDANT:  It was left behind by one of the
 2   people that were there, some other occupier.  I have no idea
 3   whose it was.
 4          THE COURT:  So you didn't take anything from your
 5   father's place, any guns?
 6          THE DEFENDANT:  No.  I didn't even bring a gun.
 7          And another thing, as you said, you know, about the
 8   reincarnation thing, I believe that's a First Amendment right
 9   to believe whatever you want religiously.  But reincarnated as
10   a woman is not true.  I said I would rather be a woman because
11   it's easier, it seems.
12          Aliens, that's also a First Amendment right to
13   believe in them.  There's a whole majority of people in this
14   country that believe that there's existence of
15   extra-terrestrials.  And I never said that I was in fear of an
16   invasion.  That's something you're putting into my mouth.  I
17   would rather you read that report correctly.
18          And, in fact, the medical report -- we had the
19   professional medical person come in and she actually said that
20   there was nothing wrong with me.  I actually had no suicidal
21   intentions.  That was only because at the time of -- at the
22   refuge, that I was being faced with threats of being raped in
23   prison.  And that's the only reason that I said I felt
24   suicidal, because I didn't want to face that.  And after the
25   FBI reassured me that that was not going to happen, I turned
```

1  myself in peacefully.

2          THE COURT:  Thank you.  I'll accept your

3  clarification.

4          In respect to this matter, the fact remains that you

5  were on probation, you were not to leave without permission,

6  and you left.  The fact that it has since been dropped is

7  not -- of no consequence as to this proceeding.  You were at

8  your father's home, you left in violation of your probation,

9  you obtained a weapon at the refuge which you had under your

10  control, and I find that you are mentally unstable, that you

11  could never purchase such a gun.  You have to be clear you

12  never had a mental issue in order to buy such a weapon.  And

13  the fact that you acquired one and were walking around with it

14  is -- with the intent of some form of violence at least as to

15  yourself.

16          In order to be prepared for trial, if you're back

17  east, or middle west, it would be very difficult.  I can't

18  imagine how you could effectively communicate with your lawyer.

19  You've made an arrangement here for you to meet with your

20  lawyer here, which you have done on an extended basis.

21          And I've looked at the whole picture.  There's no

22  assurance that you wouldn't -- would not once again find a

23  reason to do what you want to do, as opposed to what's ordered

24  by the Court.  So I'm going to deny your request for release,

25  and we'll stand ready for trial in September.

```
 1              THE DEFENDANT:  One more thing.  One of the
 2   conditions for release is this -- is to seek medical help.  And
 3   so if that condition is there, why aren't you providing me that
 4   condition?  You guys keep saying that I'm a flight risk, yet
 5   I'm promising you that I will be here.  There's no reason for
 6   me to not come here.
 7              Sean Anderson, you know, he had a warrant out for his
 8   arrest and yet you consider that disobeying -- you know, he
 9   fled through all.  And so he has been released by you, sir.
10   And so you didn't see that as a flight risk even though he was
11   already running from the police.
12              THE COURT:  You engaged in being a flight risk in
13   leaving the state.
14              THE DEFENDANT:  I actually -- the probation officer,
15   I actually told her that I was, you know, heading out there.
16   And so that's probably the reason why she didn't give me a
17   probation violation is because I actually told her.
18              And so you guys keep assuming -- you guys assume
19   about everything.  And so I am telling you that I -- there's no
20   reason for me to not go.  I have -- there's no reason.  I
21   didn't even get a probation violation because I was okay.  So
22   you guys keep assuming.  And so I was well within my law.
23              There's no reason for me to not pick up a gun.  I was
24   never diagnosed --
25              THE COURT:  You did not have permission from your
```

1    probation officer to leave the state, did you?

2           THE DEFENDANT:  I told her I was going, so --

3           THE COURT:  Telling somebody you're going to do

4    something is not obeying by the conditions.

5           THE DEFENDANT:  So why didn't she give me a probation

6    violation?

7           THE COURT:  Well, the fact that you left is a

8    violation of your probation conditions and --

9           THE DEFENDANT:  I wasn't given a probation violation,

10   so I didn't violate my probation.

11          THE COURT:  All right.  I find that you were in

12   violation and that you were a flight risk, that you fled

13   without permission, and that's where --

14          THE DEFENDANT:  I didn't flee.  If I fled, I would

15   have hid away.  Yet I was not fleeing because I openly stated

16   to the people that this is David Fry, I'm here in Oregon.

17   That's not fleeing.  That's a First Amendment right to protest.

18          THE COURT:  You've had your say, sir.

19          THE DEFENDANT:  All right.  Then we're done.

20          MR. GABRIEL:  Thank you, Your Honor.

21          THE COURT:  Court is in recess.

22          THE DEFENDANT:  You're a bigot and a liar, a racist.

23          UNIDENTIFIED FEMALE SPEAKER:  You are a racist.  I

24   agree with him.

25          THE DEFENDANT:  He's a racist.

1          UNIDENTIFIED FEMALE SPEAKER:   He is a racist.

2          (Proceedings concluded.)

--o0o--

I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause.  A transcript without an original signature or conformed signature is not certified.


*/s/Bonita J. Shumway*                          *July 22, 2016*
BONITA J. SHUMWAY, CSR, RMR, CRR        DATE
Official Court Reporter

Per C. Olson, OSB #933863
HOEVET OLSON HOWES, PC
1000 SW Broadway, Suite 1500
Portland, Oregon 97205
Telephone: (503) 228-0497
Facsimile: (503) 228-7112
Email: per@hoevetlaw.com

   Of Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>  v.<br><br>DAVID LEE FRY,<br><br>     Defendant. | Case No. 3:16-CR-00051-13-BR<br><br>DEFENDANT'S MOTION TO REOPEN DETENTION HEARING<br><br>*Hearing Requested* |

   Defendant, David Lee Fry, hereby submits this motion to reopen the detention

hearing pursuant to 88 U.S.C. § 3142(f) (detention hearing may be reopened "if the

judicial officer finds that information exists that was not known to the movant at the time

of the hearing and that has a material bearing on the issue whether there are conditions

of release that will reasonably assure the appearance of such person as required and

the safety of any other person and the community.")

   Defendant was denied release by Magistrate Judge Stacie F. Beckerman on

March 4, 2016. (Docket Nos. 240, 241). On April 4, 2016, Judge Robert E. Jones

denied defendant's Motion to Revoke the detention order. (Docket Nos. 364, 414).

Page 1 – DEFENDANT'S MOTION FOR RECONSIDERATION OF
    DETENTION STATUS

Defendant asks the court to reconsider his detention status based on the following changed circumstances that have come to pass since the Court last considered defendant's detention status.

First, the Court has granted Defendant's Motion to Dismiss Count Three of the Indictment which had alleged a violation of 18 U.S.C. § 924(c) (carrying or possessing a firearm in relation to a crime of violence). (Docket No. 671). The Court ruled that Count One, which was the alleged "crime of violence" in Count Three, categorically was not a crime of violence.

This ruling affects defendant's detention status in two ways. First, because of Count Three, there was a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(B). However, now that Count Three has been dismissed, this presumption no longer applies. Also, the ruling that the Conspiracy alleged in Count One is not a "crime of violence" tips the "factor" analysis of § 3142(g) in defendant's favor, because it can no longer be said that defendant is charged with a crime of violence.[1]

The second changed circumstance is the fact that defendant no longer is on probation in the state of Ohio. Defendant had received a one year probationary sentence for misdemeanor offenses on June 19, 2015. The state simply has allowed that probation to expire rather than seek to extend probation based on the criminal activity alleged here.

---

[1] The definition of "crime of violence" as used in § 3142(g), set forth at § 3156(a)(4), is identical to the definition of "crime of violence" in § 924(c)(3). Judge Brown ruled that the Conspiracy to Impede Federal Officers alleged in Count One was not a "crime of violence" as that term is defined in § 924(c)(3).

HOEVET OLSON HOWES, PC
ATTORNEYS AT LAW
1000 S.W. BROADWAY, #1500
PORTLAND, OREGON 97205
(503) 228-0497

Next, the plea agreements recently appearing in the docket give rise to a concern that the duration of pre-trial detention may outpace any sentence he might receive in this matter in the event of a jury finding of guilt. Defendant intends to go to trial on September 7. The government has stated that its case-in-chief will last three to four weeks; thus, the entire trial could last two months or longer, by which time defendant will have been in custody for nine months. In contrast, several defendants in this matter have entered into plea agreements that call for sentences ranging from straight probation to six months' of home confinement. In light of the likely sentence Mr. Fry faces if found guilty, continued and prolonged pretrial detention violates his right of Due Process protected by the Fifth Amendment to the United States Constitution. *See United States v. Gelfuso*, 838 F.2d 358 (9th Cir. 1988) (recognizing a due process limit on the length of pretrial detention, requiring a consideration of the length of confinement in conjunction with the extent to which the prosecution bears responsibility for the delay); *see also United States v. Aileman*, 165 F.R.D. 582 (N.D. Cal. 1996) (reading *Gelfuso* as not requiring a showing of government delay to establish a Due Process claim of prolonged pretrial detention).

Finally, defendant would note that he is the only defendant of the last four defendants to leave the refuge who remains in custody. Sean and Sandra Anderson and Wayne Banta all have been released. Because his undisputed conduct is no more serious than those defendants, defendant maintains that he should be released as well.

In addition to the foregoing, defendant would rely on all of the points and authorities he previously cited in support of his release as well as the psychological evaluation submitted under seal.

Page 3 – DEFENDANT'S MOTION FOR RECONSIDERATION OF DETENTION STATUS

HOEVET OLSON HOWES, PC
ATTORNEYS AT LAW
1000 S.W. BROADWAY, #1500
PORTLAND, OREGON 97205
(503) 228-0497

To conclude, defendant asks the Court to reopen the detention hearing and to release defendant from custody pending trial.

DATED this 21st day of June, 2016.

HOEVET OLSON HOWES, PC

_s/ Per C. Olson_
Per C. Olson, OSB #933863
Attorney for Defendant David Fry

HOEVET OLSON HOWES, PC
ATTORNEYS AT LAW
1000 S.W. BROADWAY, #1500
PORTLAND, OREGON 97205
(503) 228-0497

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 3:16-CR-00051-13-BR |
| | ) |
| v. | ) |
| | ) SUPPLEMENTAL FINDINGS |
| | ) REGARDING DEFENDANT'S |
| DAVID LEE FRY, | ) MOTION TO REVOKE |
| | ) DETENTION ORDER |
| Defendant. | ) |
| | ) |

Jones, J.

In addition to the findings noted in the minutes of proceedings [364] of the hearing as to defendant's motion to revoke his detention order, I make these additional findings to support my decision to deny defendant's motion to revoke:

- Defendant was on probation for a crime committed in Ohio when he left the state without the permission of his probation officer and came to Oregon to participate in the occupation of the Malheur Wildlife Refuge.
- Defendant had been previously admitted to a mental health facility, from which he escaped by breaking down a door.
- While at the Malheur Wildlife Refuge, defendant actively participated in the events with a weapon strapped on him.

Dated this _14ᵗ_ of ___April___ , 2016

_____
Honorable Robert E. Jones
Senior, District Court Judge

1               IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF OREGON

3                        PORTLAND DIVISION

4
UNITED STATES OF AMERICA,        )
5                                )
                     Plaintiff,  )  Case No. 3:16-cr-00051-BR(13)
6                                )
              v.                 )
7                                )  April 4, 2016
DAVID LEE FRY,                   )
8                                )
                     Defendant.  )  Portland, Oregon
9    _____)

10

11

12

13                  DETENTION REVIEW HEARING

14                 TRANSCRIPT OF PROCEEDINGS

15          BEFORE THE HONORABLE ROBERT E. JONES

16       UNITED STATES DISTRICT COURT SENIOR JUDGE

17

18

19

20

21

22

23

24

25

```
 1                              APPEARANCES

 2   FOR THE PLAINTIFF:

                              ETHAN D. KNIGHT
 3                            United States Attorney's Office
                              1000 SW Third Street
 4                            Suite 600
                              Portland, OR 97204
 5

 6

 7   FOR THE DEFENDANT:       PER C. OLSON
                              Hoevet Olson Howes, PC
 8                            1000 SW Broadway
                              Suite 1500
 9                            Portland, OR 97205

10

11

12

13

14

15

16

17

18   COURT REPORTER:         Jill L. Jessup, CSR, RMR, RDR, CRR
                              United States District Courthouse
19                            1000 SW Third Avenue, Room 301
                              Portland, OR 97204
20                            (503)326-8191

21

22                                  *   *   *

23

24

25
```

1                                    INDEX

2    DEFENSE WITNESSES:

3    WILLIAM FRY JR.                                  PAGE

4    Direct Examination                                  7

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    TRANSCRIPT OF PROCEEDINGS

2                        (In open court:)

3           THE COURT:  Good morning, everybody.  Please have a

4    seat.

5        Counsel?

6           MR. KNIGHT:  Good morning, Your Honor, we're present

7    in the matter of United States v. David Fry.  This is case

8    No. 16-CR-00051.  Ethan Knight, appearing on behalf of the

9    United States.  Mr. Fry is present, in custody, with counsel

10   Per Olson, and we're here today, Your Honor, on defendant's

11   motion to review detention upon Judge Beckerman's March 4th

12   order of detention in this case.

13          THE COURT:  Very well.

14       Counsel?

15          MR. OLSON:  Good morning, Your Honor.  Per Olson here

16   with the defendant.  We're ready to proceed as well.

17          THE COURT:  Good morning.

18       We're ready to proceed.  It's your motion.

19          MR. OLSON:  So, Your Honor, I would just point out in

20   the courtroom today is William Fry, who is the defendant's

21   father.  He's traveled out from Ohio to --

22          THE COURT:  Sir, you can come up and sit over in the

23   jury box, so you --

24          MR. OLSON:  Okay.

25          THE COURT:  -- so you don't have to look at the back

1   of their heads.

2          MR. OLSON:  Okay.  Also present is

3   Dr. Michelle Guyton, who performed the psychological

4   evaluation.

5          THE COURT:  You'll be coming up to testify; is that

6   right?

7          MR. OLSON:  I wasn't planning on calling

8   Ms. Guyton -- Dr. Guyton to testify.  I asked she come along

9   just in case.

10          THE COURT:  I would like you to step -- come on up,

11   please.

12          MR. OLSON:  Now, with regard to Mr. Fry --

13          THE COURT:  Just a minute.  Have a seat.

14      I'm pleased that you're here, and I have read your report,

15   so take it.  Go ahead.

16          MR. OLSON:  Now, with regard to Mr. Fry, I did intend

17   to have him testify, unless the Court would just prefer to have

18   me proffer what it is that he would say, but I'm prepared to

19   have him testify.

20          THE COURT:  That's fine.

21          MR. OLSON:  Okay.

22          THE COURT:  Anybody else?

23          MR. OLSON:  No, Your Honor.

24          THE COURT:  Who are these other people?

25          MR. OLSON:  Just others.

Fry - D

1          THE COURT:  Okay.

2          MR. OLSON:  No one else here on behalf of the

3   defense, Your Honor.

4          THE COURT:  All right.  Fine.  Thank you.

5       Well, it's still your motion.  Would you like to make a

6   statement?

7          MR. OLSON:  If I could call Mr. Fry to testify.

8          THE COURT:  Sure.

9          DEPUTY COURTROOM CLERK:  Raise your right hand.

10

11                      WILLIAM FRY, JR.,

12   called as a witness in behalf of the Plaintiff, being first

13   duly sworn, is examined and testified as follows:

14

15          THE WITNESS:  Yes, ma'am.

16          DEPUTY COURTROOM CLERK:  Thank you.  Just have a seat

17   here and speak into the microphone.  And would you say your

18   name and spell your name for the record.

19          THE WITNESS:  William Fry, Jr.  Spelled F-R-Y.

20

21                      DIRECT EXAMINATION

22   BY MR. OLSON:

23   Q.   Mr. Fry, are you related to the defendant, seated to my

24   right?

25   A.   Yes, I am.  He's my son.

Fry - D

1   Q.   All right.  And, sir, where do you live?

2   A.   In Blanchester, Ohio.

3   Q.   And has your son lived with you in the years leading up to

4   his arrest in this matter?

5   A.   Yes, he has.

6   Q.   And how old is your son?

7   A.   27.

8   Q.   Okay.  Sir, what is your occupation?

9   A.   I manage a dental practice.

10  Q.   And before he came out to Oregon, did the defendant, your

11  son, also work at that same dental office?

12  A.   Yes, he did.

13  Q.   And are you married?

14  A.   Yes, I am.

15  Q.   Who is your spouse?

16  A.   My wife's name is Sachio (phonetic), and she also works

17  with us.

18  Q.   Okay.  And she is the mother of the defendant?

19  A.   Correct.

20  Q.   All three of you work at that same clinic?

21  A.   We do.

22  Q.   What are your -- the hours that you work at that clinic?

23  A.   Me and my wife have different hours.  It's just kind of a

24  split shift, so we can cover the whole office during the day;

25  but she works -- her and my son both work 10:00 to 6:00.

Fry - D

1  Q.    10:00 to 6:00.

2        Roughly speaking, what are your hours there at the office?

3  A.    12:00 to 8:00.

4  Q.    Okay.  Now, if the defendant, your son, is released, is he

5  going to be able to go back to work at that same clinic with

6  those same hours?

7  A.    Yes, he would.

8  Q.    And are you basically his employer or his -- the person

9  who has the authority to hire him back or to bring him back?

10 A.    Yes.

11 Q.    And, sir, going back into -- into the past a little bit

12 here, the Court has been provided some information regarding

13 hospitalization of Mr. Fry that occurred back in 2009.  Are you

14 aware of that?

15 A.    Yes, I am.

16 Q.    The events leading up to that?

17 A.    Yes.

18 Q.    And, in fact, was that something that you played a part in

19 initiating?

20 A.    Well, I called a medical -- a mental health worker to come

21 out and do an assessment.

22 Q.    Okay.  All right.  And so was he hospitalized for a period

23 of time thereafter?

24 A.    He was.

25 Q.    And, roughly, how long?

Fry - D

1    A.   Well, he was supposed to go in for 72 hours, but there

2    were some holidays, and stuff, and he ended up being in there,

3    I think, five days.

4    Q.   Okay.  Mr. Fry, the Court has been provided some

5    information regarding what led up to that, and what I want to

6    ask you, though, is in the intervening, roughly, six or seven

7    years since that incident, have there been other similar

8    incidents where he has been hospitalized?

9    A.   No.

10    Q.   Okay.  So the defendant has lived with you for basically

11    most of his adult life; correct?

12    A.   Correct.

13    Q.   What does he do in his free time, in summary?

14    A.   Well, he's -- he's -- of course he's into computers and

15    computer games.  He hangs -- he's got a couple of friends that

16    he hangs out with sometimes.  He -- you know, like when he goes

17    out with his friends, or something, I don't know where they're

18    going or what they're doing.  I think he's been camping a

19    couple of times.

20    Q.   Okay.

21    A.   Nothing special.  Nothing spectacular.

22    Q.   Is he somebody that goes out and looks for trouble?

23    A.   Absolutely not.

24    Q.   Does he go out to bars and drink?  Does he go out

25    carousing, that sort of thing?

Fry - D

1   A.   No.  He doesn't really drink that much.  It's very rare.

2   Q.   Has he ever been involved in any sort of fighting

3   incident, or anything like that, that you're aware of?

4   A.   None that I know of.

5   Q.   Okay.  How is he regarded in your community there in

6   Blanchester?

7   A.   Well, he's -- our neighbors and everybody get along well

8   with him.  They like him.  They're all very concerned right now

9   with what's going on here.

10  Q.   Okay.  And before our last hearing, did you gather

11  together a number of letters of support from various family

12  members and members of the community there?

13  A.   I did.  It was on short notice, but -- and there was quite

14  a few that wanted to send letters but didn't get them in time.

15  Q.   Okay.  How is he regarded in the workplace?  Does he get

16  along with the employees there and the patients that come

17  through?

18  A.   He does, and sometimes he actually works with the patients

19  and the doctors.

20  Q.   Okay.  Does your son -- do you have firearms in the house?

21  A.   I do.

22  Q.   All right.  And where are those, within the house,

23  currently located?  Are they secured in any way?

24  A.   Yes.  I have a -- it's -- well, I have a safe, a huge

25  safe.  It's 900 pounds empty.

Fry - D

1  Q.   Is that -- it's a safe, I assume, with a combination lock

2  to it?

3  A.   Correct.  Yes.

4  Q.   Does Mr. Fry know the combination to that safe?

5  A.   No, he does not.

6  Q.   All right.  If ordered or asked by the Court to do so,

7  would you be willing and able to remove those firearms entirely

8  from the house and put them with another friend or relative?

9  A.   If I had to, I could.

10  Q.   Okay.  I would hope not to have to do that.

11       Okay.

12  A.   Just because I don't know where they would be safe in

13  another place.  Mostly they're double barrel shotguns that I've

14  collected over many years.

15  Q.   Okay.  Has Mr. Fry, your son, shown any fascination or

16  interest in firearms?

17  A.   No.  He's actually kind of aloof to it.  He doesn't show

18  much interest in it.

19  Q.   Okay.  Now, one of the questions I asked you before the

20  hearing today, yesterday, when we met, was whether you would

21  agree to act as somewhat of a supervisor or a -- somebody who

22  could sort of watch over David and make sure that he's being in

23  compliance with any terms of condition -- terms or conditions

24  of pretrial release.

25       Is that something that you are able to do?

Fry - D

1    A.   Yes.  Me and my wife have already spoke about that.  In

2    fact, we already mentioned it in our letter to the Court, that

3    we would be willing to do that.

4    Q.   And the hours that you work and given the fact that you

5    work in the same place, will that make it easier to be able to,

6    you know, monitor David and make sure that he's doing

7    everything the right way?

8    A.   Oh, absolutely.

9    Q.   Okay.

10   A.   If -- assuming, of course, that the Court allows him to

11   work.

12   Q.   Okay.  Sure.  And, now, David's -- David had a vehicle or

13   he has a vehicle, but it's not in your possession; correct?

14   A.   No, it's not right now.

15   Q.   Is that somewhere in eastern Oregon?

16   A.   Correct.

17   Q.   So if he were to be released and go back to Ohio, would he

18   have to rely on others for transportation?

19   A.   Yes.

20   Q.   And could he rely on either yourself or your wife to get

21   him to and from work?

22   A.   Yes, he would.  And he could, I should say.

23   Q.   Okay.  Sure.  If the Court were to allow this or to order

24   this, would you be willing to make sure that David gets to

25   meetings that he has with his pretrial services officer?

Fry - D

1   A.   Yes, I would.

2   Q.   Would you be able to make sure that he gets to any mental

3   health counseling meetings that he has?

4   A.   Yes.

5   Q.   And would you report any violations, including violations

6   relating to use of marijuana?

7   A.   I would, but I don't foresee it happening.

8   Q.   Okay.  Why is that?

9   A.   I think if he knows that we're all working together as a

10  family to fulfill these commitments, I think he would

11  understand that and agree to those terms.

12          MR. OLSON:  Okay.  Your Honor, I have no further

13  questions.

14          MR. KNIGHT:  No questions, Your Honor.  Thank you.

15          THE COURT:  I have a few.

16      So you're an old marine, huh?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  Okay.  I guess we can accept you as a

19  full-fledged jarhead, then.

20          THE WITNESS:  Semper fi.

21          THE COURT:  On a very serious matter here today, you

22  said that he is aloof to weapons.  Are you aware of the weapons

23  that were found in his vehicle?

24          THE WITNESS:  Yes, Your Honor, I am.

25          THE COURT:  Do you want to describe what you know?

14

1          THE WITNESS:  Well, I've heard that there were
2   several weapons found in his vehicle, and it was my
3   understanding he put them there for safekeeping.
4          THE COURT:  Do you know what type of weapons they
5   were?
6          THE WITNESS:  The only weapon I've seen was a
7   shotgun.  That's all I know of.
8          THE COURT:  And those were not your weapons, were
9   they?
10          THE WITNESS:  No, they were not.  He didn't bring any
11   weapons with him.
12          THE COURT:  He got them from some other source.  You
13   can have all your weapons under lock and key, but he obviously
14   had resource to other weapons because they were found in his
15   car; is that correct?
16          THE WITNESS:  That's correct.  He -- I understand he
17   got those from the refuge when people left their weapons
18   behind.
19          THE COURT:  And have you seen the portrayal of him
20   going around the compound with a weapon strapped on?
21          THE WITNESS:  Yes.  Yes, Your Honor, I did.
22          THE COURT:  And yet you say he's aloof to firearms?
23          THE WITNESS:  Yes, Your Honor.  He didn't -- when
24   he's lived with me, he's never shown an interest in actually
25   going out and shooting, practicing shooting.

1          THE COURT:  But he is now?

2          THE WITNESS:  Well, I don't know if he did any

3  shooting.

4          THE COURT:  Well, he's not been showing any aloof to

5  weapons.

6    I appreciate very much the hardship that you are going

7  through, and your family, and that very fragile situation that

8  your son is in psychologically.

9    As I understand it, you've encouraged him to take his

10  medication; is that correct?

11          THE WITNESS:  That was in the 2008/2009 time frame.

12          THE COURT:  He refuses to take it today?

13          THE WITNESS:  I don't know that he was -- I don't

14  know that he was ever prescribed any medication.  It was while

15  he was under the 72-hour watch.

16          THE COURT:  But he has a history of refusing to use

17  medication; is that correct?  Mental -- for his mental

18  condition.

19          THE WITNESS:  I do not know of that, Your Honor.  I

20  don't think that he's ever been prescribed medication on a --

21  you know, as a requirement.

22    If he has, I don't know about that.

23          THE COURT:  Okay.  Thank you.  Anything further?

24          MR. OLSON:  Not from this witness, Your Honor.  Thank

25  you.

1          THE COURT:  I appreciate you coming all the way out.

2   Thank you.

3          THE WITNESS:  Thank you, Your Honor.

4          MR. OLSON:  So, Your Honor, I don't have any other

5   witnesses, but if I could just pick up on the questions that

6   Your Honor was asking Mr. Fry just now, and I have in front of

7   me the -- kind of the summary of negotiation phone calls that

8   occurred between Mr. Fry and the FBI individuals that were

9   trying to get them out of the refuge.  On February 8th, Mr. Fry

10  had a conversation with one of the negotiators about the very

11  topic of Mr. Fry having firearms in his vehicle, and, as he

12  explained to the negotiator, he did find a number of rifles

13  around the refuge that had been abandoned by other people who

14  had left, that did not have safeties, and there -- there was

15  another firearm.  It looked like a Chinese-made firearm.  It

16  did not look very safe.  It looked like a dangerous weapon.

17      And so as Mr. Fry explained then and as he would explain

18  now, he put those rifles in his vehicle so -- for safe -- not

19  for safekeeping, per se -- in other words, not to keep the

20  firearms safe, but to keep others safe from the firearms.

21      And so that's what he said at the time so that there would

22  be no accidents, is what he told the negotiator.

23      And so the other point that I want to make about

24  prescription medication --

25          THE COURT:  Well, what about the firearm strapped on

1  him?

2      MR. OLSON:  Okay.  Your Honor, that gets to kind of

3  my bigger point that I made before Judge Beckerman, and I'll

4  make here now, and that is when we look at Mr. Fry's course of

5  conduct over the entire time that he was at the Malheur

6  Wildlife Refuge, there's a marked shift in that conduct and in

7  his emotions after LaVoy Finicum is shot and killed and after a

8  number of people leave the refuge.  Up to that point in time --

9  and we know this because Mr. Fry was posting videos on his

10  YouTube channel.  Up to that point in time, Mr. Fry is

11  lighthearted.  He's showing videos of wildlife.  There are

12  other videos with sort of a comical element to it.

13      After that incident, which was very frightening for

14  everyone there because they had reason to believe that this

15  individual, LaVoy Finicum, who Mr. Fry had gotten to know and

16  had gotten to like, they had reason to believe that he was

17  wrongfully killed, and so they were fearful that a similar fate

18  would face them as they continued to play out the days that

19  would ensue there at the refuge.

20      And that really comes across in the videos that happened

21  after that point in time.  They're dark.  They're speaking in

22  hushed tones.  They're fearful.  They move out of the

23  buildings, in a sign of good faith, to the parking lot and set

24  up a camp there to show they've removed themselves from the

25  buildings themselves, but now they're in a cold environment.

1   They have food, but they're surrounded by sagebrush, you know,

2   and they don't know what is beyond the sagebrush, and it --

3   fear set in, Your Honor.

4       And so, yes, he did carry a firearm during that period of

5   time, as depicted in those videos, and that's an inescapable

6   fact that we have to deal with here.  But that's the

7   environment, and that's the situation that he was in.  Very

8   fearful of being apprehended in a violent way.

9       And, also, as time went on, as he's posting things to

10  YouTube, he's communicating to the outside world, he has people

11  communicating to him, telling him -- telling him that when he

12  gets arrested he's going to go to jail and he's going to get

13  raped, things like that, repeated comments, that for him, a man

14  of his size, was very fearful of also.  And so it became a very

15  stressful situation for Mr. Fry.

16      And Dr. Guyton talks about this somewhat in her report

17  that, you know, when he is in those stressful situations, he

18  may say things that are very alarming, and he did say things

19  that were, I'm sure, very alarming to the FBI agents.

20          THE COURT:  Such as?

21          MR. OLSON:  Well, statements about, you know, "If

22  they're going to come in, you know, I'll shoot myself before --

23  they won't take me alive."  Statements like that.  But it was

24  based on -- it was fundamentally rooted, not in a generic or

25  absolute refusal ever to obey a command or an order of a

1    government official, it was rooted in that circumstance that

2    existed at that time of being incredibly fearful and under

3    incredible stress.  And so that's -- that was the environment

4    that he was in, and Dr. Guyton talks about that being that

5    situational cause to that sort of behavior.

6        So what we're proposing here with our release plan is to

7    put him back into a place where he is safe, where he feels

8    safe, where those types of stressors are unlikely to arise.  He

9    can go to work, a place that he's used to.  He can be in his

10   community, around friends and loved ones.  He's obviously not

11   coming out and wanting to engage in the similar sort of conduct

12   that will get him in similar conduct -- or similar trouble.

13       So what we're proposing here, Your Honor, especially by --

14   if I may say, kind of upping the ante, by imposing that Mr. Fry

15   actually act as a supervisor and report any violations that he

16   sees in Mr. Fry's conduct.

17       And, knowing that, as Mr. Fry described to me yesterday,

18   that alone will help Mr. Fry be in compliance because he's not

19   going to want to get his father in trouble, you know, by acting

20   out and putting his father in a difficult position of "Do I

21   report or not?"  And so he doesn't -- he doesn't want to put

22   his father in that position or his mother, so that will be an

23   extra layer of protection that the Court can look to.

24       So he does not have a --

25            THE COURT:  Well, as to the father, your client has

1    been in conflict with him in the past, has he not, when the
2    father tried to impose restrictions on him?

3            MR. OLSON:  Oh, I'm sure it hasn't been a perfect
4    relationship in that regard, and you're correct in that, you
5    know, his father, as we discussed, did play a role in Mr. Fry
6    being hospitalized back in 2009, and I'm sure Mr. Fry was not
7    incredibly pleased by that.  But here it's just one factor,
8    among many, that I believe will keep Mr. Fry in compliance.

9        He's taking these charges very seriously.  He's been very
10   serious about these charges and going through the discovery
11   when I've met with him.  He understands the significance of
12   this, and I feel that when you look at these people who've
13   really gone out of their way to write these letters to the
14   Court, who really have expressed a lot of love and support for
15   him, you can see that that's where he's going to.  That's the
16   community that he's going to.  He's returning home to a safe
17   place.

18       I understand there will probably be some steps to
19   ultimately fulfill this.  We have to get a referral made to the
20   Ohio Pretrial Services Office, and I'm sure there are some
21   other things we would need to do.  He has a passport that I'm
22   sure will need to be surrendered and that sort of thing.

23       But, Your Honor, we're not sure how long this is going to
24   take before this matter goes to trial, and it could be a while,
25   as the Court is aware.

1        THE COURT:  Well, today I received a memo from

2   Judge Brown that said it's going to start Labor Day, after --

3   immediately after Labor Day.  And supposedly she's trying to

4   hold it into one trial, but that's still not settled.

5        MR. OLSON:  Right.

6        THE COURT:  Yes.

7        MR. OLSON:  Sure.  So I think those were the points I

8   wanted to touch on, Your Honor.

9        THE COURT:  I appreciate it very much.

10       MR. OLSON:  Thank you.

11       THE COURT:  Did you want to make any statement?

12       MR. KNIGHT:  Briefly, Your Honor.  Thank you.

13     The government continues to agree with the recommendation

14   of pretrial services that Mr. Fry continue to be detained prior

15   to trial.

16     Not to belabor the point, but there are a couple of

17   salient items underlying this case that we think support

18   pretrial's recommendation and really support continued

19   detention in this case that are unique, in this instance, to

20   Mr. Fry.  The first of which, of course, is the nature of the

21   offense itself.

22     As the Court alluded to a little bit just minutes ago,

23   Mr. Fry was, in fact, the last person to leave the refuge, and

24   regardless of what circumstances may have caused it to be

25   stressful, during that time he repeatedly disregarded the

1    orders and requests of law enforcement. So of course when we
2    talk about any prospective release plan, we have to think about
3    the likelihood that he may follow directions, and we think,
4    given the facts and the history, that likelihood is, in fact,
5    low.

6        There's ample evidence to support that, including recorded
7    statements of this defendant, about his unwillingness to be
8    taken into custody, about his willingness to declare war on the
9    federal government. Again, we think these illustrate
10   particular issues with any supervision plan.

11       The second concern, of course, relates to firearms. We've
12   heard testimony and there is evidence that the defendant, while
13   on the refuge, was willing to possess and actively carry
14   firearms. There's an inherent danger there. It's been opined
15   today that the reasons were he was fearful at that time and on
16   the refuge, but when you couple those decisions made by this
17   defendant to arm himself with the clear history of mental
18   health issues, we believe that underscores the fact that
19   there's no clear release plan that would ensure the safety of
20   the community or this defendant's appearance, which I think
21   gets us to our final point, and that is in addition to the
22   unique nature of the offense itself and the facts the Court
23   knows, the very existence of this mental health issue, which
24   really is the undercurrent, from everything we've heard today,
25   and pretrial's investigation again gets us to the point where

1  there is no set of conditions, combination of conditions, that

2  would assure the appearance of this defendant in any future

3  court appearance or, more importantly, assure that he would

4  comply with the recommendation and supervision of pretrial

5  services, which we believe is why they are recommending

6  continued detention and why the government feels that under its

7  burden of proof it's the clear position --

8          THE COURT:  Is the burden, with the new charges, of

9  presumption?

10         MR. KNIGHT:  Of course that is the one fact that has

11  indeed changed since the March 4th detention hearing,

12  Your Honor, and that is the addition of an allegation of

13  18 U.S.C. 924(c), using a firearm while committing a crime of

14  violence, which does indeed carry a presumption of detention,

15  and that is an added factor, we believe, in addition to the

16  facts already on the record and already established and

17  demonstrated.

18      So that really is the only new fact, and it doesn't enure

19  to the defendant's benefit today.  Thank you.

20         THE COURT:  Any rebuttal?

21         MR. OLSON:  Your Honor, my client is wanting to speak

22  with me, so if I may just have a moment?

23         THE COURT:  Oh, of course.

24             (Counsel and defendant conferring.)

25         THE DEFENDANT:  Sir, Your Honor, as far as the mental

1 | health issues goes, it wasn't that I was doing anything wrong.
2 | In the state of Ohio, someone can just call the mental board on
3 | you, and they can come and snatch you away.  I was having a
4 | rough time.  I actually came to Oregon at that time.  I was
5 | looking for a job.  I was really depressed, and there was just
6 | a lot of depression, and he felt that -- instead of confronting
7 | me about it, he just called the mental board, and so they just
8 | came and snatched me away and I told them, you know, it was
9 | just certain issues, and they felt that they had to take me
10 | away for that.

11 | So that -- that's kind of being over -- over, you know,
12 | bloated, in my opinion.

13 | And as far as violent, that goes -- I'm absolutely not
14 | violent, and I told the police officers -- or the FBI officers
15 | multiple times that I wasn't trying to kill anybody.  I don't
16 | want to hurt anybody.  I would rather kill myself before I hurt
17 | somebody else.  And so when the FBI people came in their SWAT
18 | vehicles and all that stuff.  I mean, they felt comfortable
19 | enough to stand by their sides -- with their guns on their
20 | sides like this.  They're just standing around, looking at us,
21 | telling us to come out.  They felt comfortable enough to do
22 | that and not come in with their guns pointing at us.

23 | So they knew we weren't a threat.

24 | We weren't trying to hurt anybody, and they knew that.
25 | And so I just wanted to make that -- make that -- make that

1   known.

2          THE COURT:  Okay.  Anything else you want to say?

3          THE DEFENDANT:  I'm absolutely not a violent person,

4   Your Honor.  As my dad says, you know, I don't like guns.  I

5   was unchambering all the weapons there just to make sure no one

6   would accidently misfire a gun.  I was unchambering as many as

7   I could.

8          The ones I couldn't figure out how to unchamber or the

9   ones with the safety on them, those were the guns I put inside

10  the car.  The car was dead.  The battery was dead.  It had a

11  flat tire.  I wasn't driving the vehicle.  I put them in there

12  so nobody would accidently use it or trip on it and cause it to

13  go off or something.  I was trying to be absolutely safe.

14         The reason I stayed was because I was the last cameraman.

15  All the other cameramen, Pete Santilli, the news media, they

16  were cut out from the event.

17         So, as the last cameraman, I felt an obligation to hold

18  out "and videotape the whole event so that we would have a

19  non-bias or a -- or, like, a third-party media going on,

20  besides the FBI.

21         The FBI -- it's already been known that the FBI lied about

22  shooting LaVoy Finicum, so why wouldn't they have lied if

23  something happened at that event if I wasn't there videotaping

24  everything?

25         THE COURT:  Did you turn your videotapes over?

1          THE DEFENDANT:  Yes.  All the videotapes."  I left

2     all of the video.  I even told the FBI where they could go find

3     all my videotapes and the USB drives.  I was completely upfront

4     and honest about everything.

5          THE COURT:  Does the government have them?

6          MR. KNIGHT:  We're still reviewing the evidence

7     seized from the refuge itself.  A lot of it was live-streamed

8     at the time of the occupation, which is where we got it.

9          THE COURT:  That's fine.  Go ahead.

10          THE DEFENDANT:  So I was being absolutely upfront

11    with the police officers.  I'm not hiding anything.  I have

12    nothing to hide.  I didn't even come to the refuge with a

13    weapon or firearms, so there's nothing -- I -- I had no

14    intentions of hurting anybody or anything like that.  I came to

15    be a -- document the whole event, basically, as a -- as a

16    video -- video person.

17          THE COURT:  Okay.  Thank you very much.

18          THE DEFENDANT:  Thank you.

19          THE COURT:  Anything further?

20          MR. OLSON:  Your Honor, one other point regarding the

21    presumption, and it occurred to me this morning, as I was

22    preparing, that that may be an issue -- I hadn't thought of

23    that -- Count 3, which is "use and carry of firearm in relation

24    to a crime of violence," that is one of the statutes that

25    listed as one where the burden is more on the defense to

1  establish release.

2      Your Honor, I think by bringing that up I do want to just
3  briefly address that this is going to be a very difficult count
4  for the government to prove, and I think the nature of the
5  offense and the strength of the offense is one thing that we
6  can talk about here in relation to that.

7      I intend to file a motion to dismiss Count 3 because
8  Count 1, which is -- which refers to it as a crime of violence,
9  is not, in fact, a crime of violence.  And when we look at
10 Count 1 -- when we look at the definition of "crime of
11 violence," there's a very specific definition laid out in
12 Section 924 relating to crime of violence.

13     And it's a two-part definition.  It's one that we see
14 throughout the U.S. Code.  One half of it has been rendered
15 null and void as a result of the *Johnson* decision.

16     It's the residual clause.  So that -- that one is going to
17 be out.

18     The other clause is does the crime have an element, the
19 use, the threatened use of -- or actual use of or attempted use
20 of physical force, and when you look at Count 1, Section 372,
21 it does not contain that element.  None of those elements.  It
22 contains the elements of intimidation or -- it does say
23 "threats," which is an alternative way of committing the crime,
24 but it doesn't say "threats of physical violence."

25     And there are reported decisions out there of people who

1  have violated the statute by sending offensive or harassing,

2  you know, kind of bogus legal things on bankruptcy judges, and

3  that sort of thing; in other words, cases that do not involve

4  any actual physical threats or any actual violence. And so I

5  just point that out to Your Honor.

6      I don't know if that's going to be the determining factor

7  here today, but my only point to make is that Count 3 is a very

8  questionable count here in the government's arsenal of counts.

9      So, with that, Your Honor, just one last point:  In

10  meeting with Dr. Guyton before court today, you know, one thing

11  she said is that, look, Mr. Fry does not have a condition that

12  prohibits him from complying with terms of his release.  Some

13  people do.  You know, they have some mental condition that,

14  just, they can't do it.  They just can't comply.  But he's

15  smart enough to understand what he's supposed to do, and he's

16  smart enough to understand the consequences of --

17          THE COURT:  I wanted to hear from the psychotherapist

18  as to -- as I understand your report -- you don't have to be

19  sworn -- this is just for information to the Court.  He suffers

20  from obvious mental problems, but do I understand your report

21  that he does not require any prescription medication for a

22  mental condition at this time?

23          DR. GUYTON:  I do not believe he requires medication

24  for any particular condition.  The things that he is diagnosed

25  with at this time are not things that are readily treated

1   with -- with psychiatric medications.

2          THE COURT:  So there won't be a battle of him being

3   forced to take medication?

4          DR. GUYTON:  I don't think he needs to take

5   medications.  He's not been -- as I think his father suggested,

6   he's not been requested to take medications in the last several

7   years.  They were offered to him when he was --

8          THE COURT:  That had been an issue previously where

9   he --

10          DR. GUYTON:  At the hospital, yes.

11          THE COURT:  -- where there was a dispute about taking

12   any medication.

13          DR. GUYTON:  At the hospital they wanted to give him

14   medications, and he refused.

15          THE COURT:  Thank you.  Anything further?

16          MR. OLSON:  No, Your Honor.  Thank you.

17          THE COURT:  All right.  First of all, I want to

18   address you personally.  You can just sit.

19          MR. OLSON:  Okay.

20          THE COURT:  You can just sit.

21       There are a lot of things about you that are positive.

22   You're obviously, by nature, a gentle person; that you've shown

23   a great affection for animals and the environment and so forth.

24   You got into some -- when you get into a tight situation,

25   though, you can act out, and that concerns me a lot.

1      While you were in the mental institution -- can we call it

2   that -- you broke out; is that correct?

3          THE DEFENDANT:  It is correct.

4          THE COURT:  Okay.  You kicked in a door and you got

5   out against the will of the people running the place.

6      Then, as far as the officer is concerned, you got into a

7   physical altercation or dispute with an arresting officer; is

8   that correct?  As I understand it, you caught your foot in the

9   door and you were pushing away.  But you did get into an

10  altercation; is that correct?

11         THE DEFENDANT:  Well, it was -- he -- my foot was

12  caught in the door, and he was upset about that, and so he

13  yanked me out of the car.  I never -- I never attempted to hurt

14  him or strike at him or anything like that.

15         THE COURT:  Then I don't want to cause more

16  difficulties for you, from your mental state, but I have to

17  point out, I think, that you are having a very difficult time

18  with your living life as it is for you now and that in this

19  case you asked to have suicide by the authorities; that "they

20  won't take me alive."  Is that correct?

21         THE DEFENDANT:  Sir, I was worried.  If you -- you

22  know about the -- my mental disorder, and it's not a disease

23  that you can treat with medications.  You know that.  And I was

24  worried about -- you can -- if I had the time to pull up all

25  the comments, I would.  For 30 days straight people were

1   saying, "You need to go to prison to be raped," and all these

2   horrendous things.  And after 30 days, that gets to you.  And

3   so that was -- if you -- if you put it in the context of the

4   situation, then you would understand why I felt the way I did

5   in the stressful situation.

6       But now that I've been assured by the FBI -- because

7   that's the reason I came out peacefully, is because the FBI

8   assured that that is not true and that's what I needed to hear

9   from the policeman, so --

10          THE COURT:  You found that to be so.  You haven't

11  been raped or molested while you're in custody?

12          THE DEFENDANT:  No.  No, I have not, sir.

13          THE COURT:  Thank you.

14      I'm also concerned about your frustration with your

15  identification and that you would really prefer to die and come

16  back -- be reincarnated into a new life.  Is that correct?

17          THE DEFENDANT:  Sir, if I have to -- everybody has to

18  die.  I mean, that's inevitable; right?  So right now I've

19  preserved my virginity, you know, front and back, you know, and

20  I don't plan to lose it without -- for no reason, and so --

21          THE COURT:  That's not what I asked you.  I'm more

22  concerned about that -- we have to worry about your own safety,

23  not only the safety of others, and --

24          THE DEFENDANT:  I understand.

25          THE COURT:  -- in the environment where you are,

1   you're safe.  If you get out and more stresses come up, pushing

2   on you to get active again, do all sorts of things.

3          THE DEFENDANT:  I only came out to protest, sir.  I

4   didn't come out to do anything but other than to protest and

5   state, you know, my opinion.  I have much concern for the

6   society, you know, and I -- I absolutely do not feel suicidal.

7   I plan to see this go through.  This is one of the biggest

8   cases in a long time in American history, and I really would

9   like to see what goes on and to -- speaking from biblical

10  terms, there's a lot happening that I would like to see go

11  through.  And so I have absolutely no --

12         THE COURT:  That's another weird thing about you,

13  saying that you are now a traditional Jew.

14         THE DEFENDANT:  Well, no.  Not a traditional Jew.

15     A Judeo-Christian.  A Judeo-Christian is someone who

16  believes you should celebrate and keep the feasts.  Instead of

17  Easter, I celebrate Passover; instead of Christmas, I celebrate

18  Tabernacles.  I keep the feasts.

19     If you follow the Old Testament -- one of the main reasons

20  that I threated with suicide was in the Old Testament there was

21  a story of people who were about to be invaded by an army of

22  uncircumcised men, and they jumped on their swords, because

23  these men would come out and rape them.  So, biblically

24  speaking, in an extent like of something of that nature, it was

25  justified.

1       So, in my opinion, if -- if I was being threatened with

2   rape and the law enforcement weren't going to try to stop that,

3   then it would have been justified.  But the law enforcement in

4   this case said that that won't be happening; that I would be

5   segregated from the more violent, you know, prisoners, and

6   stuff like that, and it makes sense.  And so I took their word

7   for it, and I -- I'm trusting the law enforcement in this case

8   to keep that promise.

9       So I am not threatening myself with suicide.  I would like

10  to see it go through, sir.

11          THE COURT:  All right.  Here's the thing:  I look at

12  you as a vulnerable person, and the stresses out there, as

13  you've already pointed out, are enormous.  The amount of email

14  the Court receives, disturbing type of comments, you'll be

15  subject to all sorts of stresses out there.  You came out

16  against your -- leaving your dad, leaving the practice you

17  needed to help.  You came out here to try to solve this problem

18  yourself.  That was totally impulsive.

19      I'm going to keep you in custody until the trial, but with

20  the understanding that you'll be given extra protection because

21  you are vulnerable and that you'll be here for the trial.  And

22  thanks to Judge Brown's court case management, you'll have this

23  opportunity to participate in the trial, which will be very,

24  very soon, commendably so.  So without punishing you -- this is

25  not for punishment.  It's really to protect you from hurting

1   yourself, getting into another stressful situation and you act

2   out again.

3          THE DEFENDANT:  You know, if you -- if you trade --

4   if you trade freedom for safety, then you deserve neither, man,

5   and so we both understand that.  You know, you keep saying this

6   is for my protection and that I'm worried about comments from

7   my Internet, but that's not true.  It's because I was -- you're

8   not looking at it in the context of the situation.

9       Back at home I would be absolutely fine.  I'm not even

10  looking at those comments anymore.

11         THE COURT:  You left -- you left home.  You came out

12  here.

13         THE DEFENDANT:  That's not true, sir.  I had -- I

14  came out here for a specific reason.  It's for biblical

15  reasons.  I did not come out here to disobey anybody.  I have

16  the First Amendment right for freedom of religion, sir.  So

17  speaking from that -- Fukushima is a serious concern.  It's

18  destroying the Pacific Ocean.  I felt this event was a perfect

19  place to speak out to the world, to speak out to America, that

20  we have greater problems besides, you know, a lot of these

21  things like arming moderate rebels, and stuff, you know, over

22  in Iraq.

23      You know, I'm here -- I was here to protect people.  I was

24  absolutely no means by --

25         THE COURT:  And you're worried about drones and

1   you're worried about UFOs and you're worried about a lot of

2   things.  It's just that you have to appreciate that what we're

3   trying to do is to make sure that you ultimately get a full and

4   fair trial, and that's it.  So the court is in recess.

5           THE DEFENDANT:  Of course.  I don't feel safe here,

6   sir.  I'm getting rashes by something, and I'm breaking out

7   from diseases.  I'm catching diseases by being here.  It's not

8   safe, Your Honor.

9           THE COURT:  Check into that, too.  Thank you.

10                  (Hearing concluded.)

```
 1                    C E R T I F I C A T E

 2

 3           United States of America v. David Lee Fry

 4                    3:16-cr-00051-BR(13)

 5                  DETENTION REVIEW HEARING

 6                      April 4, 2016

 7

 8          I certify, by signing below, that the foregoing is a

 9  true and correct transcript of the record, taken by

10  stenographic means, of the proceedings in the above-entitled

11  cause.  A transcript without an original signature, conformed

12  signature, or digitally signed signature is not certified.

13

14  /s/Jill L. Jessup, CSR, RMR, RDR, CRR

15  _____

16  Official Court Reporter     Signature Date: 7/26/16
    Oregon CSR No. 98-0346      CSR Expiration Date:  3/31/17

17

18

19

20

21

22

23

24

25
```

ORP DET ORD (1/15/16)

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. **3:16-cr-00051-BR-13** |
| v. | |
| **David Lee Fry** | ORDER OF DETENTION AFTER HEARING (18 USC § 3142(i)) |

☑ On motion of the Government involving an alleged:

    ☑ risk to the safety of any other person or the community for cases involving crimes described in 18 USC § 3142(f)(1)

    ☑ serious risk defendant will flee;

    ☐ serious risk defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate a prospective witness or juror or attempt to do so,

☐ Upon consideration by the court *sua sponte* involving a:

    ☐ serious risk defendant will flee;

    ☐ serious risk defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate a prospective witness or juror or attempt to do so,

Having considered the nature and circumstances of the offense charged, the weight of evidence against the defendant, the history and characteristics of the defendant, and the nature and seriousness of the danger to any person and to the community that would be posed by the defendant's release, the court finds that:

☐ The offense charged creates a rebuttable presumption in 18 USC § 3142(e) that no combination of conditions will reasonably assure the safety of the community.

☑ No condition or combination of conditions will reasonably assure the appearance of defendant as required due to:

| | | |
|---|---|---|
| ☐ Foreign citizenship and/or illegal alien | ☐ In custody/serving sentence | ☑ Substance use/abuse |
| ☐ ICE Detainer | ☐ Outstanding warrant(s) | ☐ Unknown family/employment/community ties |
| ☐ Deportation(s) | ☑ Prior failure(s) to appear | ☐ Unstable/no residence available |
| ☐ Multiple or false identifiers | ☑ Mental health issues | ☐ Information unverified/unverifiable |
| ☐ Aliases | | |

  ☑ Prior criminal history, ☑ including drug/drug related offense, ☐ including alcohol/alcohol related offense

  ☐ Prior supervision failure(s), ☐ Including illicit drug use, ☐ including alcohol abuse

  ☑ Other: _nature of charged offense, on probation at time of offense_

☑ No condition or combination of conditions will reasonably assure the safety of other persons and the community due to:

| | |
|---|---|
| ☑ Nature of offense | ☐ Prior supervision failures |
| ☑ Arrest behavior | ☑ Substance use/abuse |
| ☑ Possession of weapon(s) | ☑ Mental health issues |
| ☑ Violent behavior | ☐ Alleged offense involves child pornography on the internet |
| ☑ Prior criminal history, ☑ including drug/drug related offense, | ☐ including alcohol/alcohol related offense |
| ☐ Prior supervision failure(s), ☐ Including illicit drug use, | ☐ including alcohol abuse |

  ☑ Other: _on probation at time of offense_

☐ Other (writ/serving federal or state sentence): _____

☐ Defendant has not rebutted by sufficient evidence to the contrary the presumption provided in 18 USC § 3142(e).

☐ The defendant is detained without prejudice to further review by the court at a later date.

**THEREFORE, IT IS ORDERED** that:

1. Defendant is detained prior to trial;
2. Defendant is committed to the custody of the Attorney General for confinement in a corrections facility separated, as far as practicable, from persons awaiting or serving sentences or being held in custody pending appeal;
3. Defendant shall be afforded a reasonable opportunity for private consultation with his counsel;
4. The superintendent of the corrections facility in which defendant is confined shall make the defendant available to the United States Marshal for the purpose of appearance in connection with any court proceeding.

DATED: _March 4, 2016_        _[signature]_

                                   United States Magistrate Judge

1        IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF OREGON

3              PORTLAND DIVISION

4
UNITED STATES OF AMERICA,        )
5                                 )
                    Plaintiff,  ) Case No. 3:16-cr-00051-BR(13)
6                                 )
              v.                  )
7                                 ) March 4, 2016
DAVID LEE FRY,                    )
8                                 )
                    Defendant.  ) Portland, Oregon
9 _____)

10

11

12

13          CONTINUED DETENTION HEARING

14          TRANSCRIPT OF PROCEEDINGS

15       BEFORE THE HONORABLE STACIE F. BECKERMAN

16     UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

```
 1                              APPEARANCES

 2    FOR THE PLAINTIFF:
                              ETHAN D. KNIGHT
 3                            United States Attorney's Office
                              1000 SW Third Street
 4                            Suite 600
                              Portland, OR 97204
 5
      FOR THE PLAINTIFF:
 6                            CRAIG GABRIEL
                              United States Attorney's Office
 7                            1000 SW Third Street
                              Suite 600
 8                            Portland, OR 97204

 9

10    FOR THE DEFENDANT:      PER C. OLSON
                              Hoevet Olson Howes, PC
11                            1000 SW Broadway
                              Suite 1500
12                            Portland, OR 97205

13

14

15

16

17

18

19

20

21

22    COURT REPORTER:        Jill L. Jessup, CSR, RMR, RDR, CRR
                              United States District Courthouse
23                            1000 SW Third Avenue, Room 301
                              Portland, OR 97204
24                            (503)326-8191

25
```

1                                    *   *   *

2                          TRANSCRIPT OF PROCEEDINGS

3              DEPUTY COURTROOM CLERK:  All rise.

4              MR. KNIGHT:  Good afternoon, Your Honor.  First

5    matter on today's docket is United States v. David Fry.  This

6    is Case No. 16-CR-00051.  Ethan Knight and Craig Gabriel,

7    appearing on behalf of the United States.  The defendant is

8    present, in custody, with counsel Per Olson, and we're here

9    today, Your Honor, for defendant's motion for release.

10             THE COURT:  Thank you, Mr. Knight.

11        Mr. Olson?

12             MR. OLSON:  Good afternoon, Your Honor.  Per Olson

13   here with Mr. Fry.  We're prepared to proceed for this hearing.

14             THE COURT:  Thank you.  First, for the record, is the

15   government seeking continued detention of the defendant, and,

16   if so, on what grounds?

17             MR. KNIGHT:  Your Honor, the government is at this

18   time seeking continued detention of Mr. Fry, and we are in

19   agreement with the recommendation of Pretrial Services to do

20   so.  And when the Court would like, I can expand on that a

21   little bit.

22             THE COURT:  Why don't you do so now, and I'll give

23   Mr. Olson an opportunity to respond.

24             MR. KNIGHT:  Thank you, Your Honor.  With respect to

25   Mr. Fry, the government is, again, in agreement with the

1   recommendation of Pretrial Services that he be detained both as

2   a danger and a flight risk.  Even by the standards of this

3   case, Your Honor, it's the government's position that Mr. Fry

4   poses an especially unique case and that there are

5   characteristics and circumstances attendant to this defendant,

6   above and beyond the occupation as a whole, that should cause

7   this Court concern and further supports the government's

8   position under its burden of proof.

9        Let me say there are -- it's the intersection, really, of

10  three factors in Mr. Fry's case, we believe, that support

11  detention.  It's of course his repeated willingness to

12  disregard the direction of federal law enforcement,

13  particularly as an individual who stayed well beyond the

14  initial round of arrests on January 26; second, the acute

15  mental health issues that are laid out both in the Pretrial

16  Services report and we believe in the materials presented to

17  the Court by the defendant; and, finally, the danger he poses

18  as someone willing to possess and actively carry firearms in

19  the course of this case.

20       It's those three things, when you look at the statutory

21  factors, that should give this Court concern and we believe

22  provide a robust factual basis for continued detention.

23       First, Your Honor, with respect to the nature and the

24  circumstances of the offense and, relatedly, the weight of the

25  evidence, of course there's the inherent danger attendant to

1  this offense; the fact that in this case Mr. Fry stayed well

2  past the initial round of arrests and made a decision, really,

3  to stay until there was no other choice and that, really, he

4  had to leave.

5      In that respect, it's his role in the offense that's a

6  little bit different.  As one of four remaining individuals, he

7  made a profound and repeated choice to ignore federal law

8  enforcement, to ignore the direction and request to leave, and,

9  in doing so, I think has demonstrated a continued inability to

10  follow directions in any consistent manner.  And that also is

11  spoken to a little bit by his specific nature and

12  characteristics and history.

13      While he was there, the government -- or, pardon me,

14  Mr. Fry made a number of recorded statements about his intent

15  in what he was doing.  At this stage the government is not

16  going to play a number of those.  However, to paraphrase them

17  generally, they were very much in the vein defiant of

18  government authority, defiant of any requests or suggestion

19  that he leave, and inherently violent.  The most succinct one

20  of those things that I'll repeat for the Court was made on

21  February 11th of this year, and that's when he said on video,

22  quote, "I declare war against the federal government."

23      In isolation, Your Honor, a statement like that may have

24  less weight when taken in the context of any statements; but,

25  in this case, statements like that and the behavior of Mr. Fry

1    in that period of time after January 26th, really are

2    aggravated by the presence and availability and use by virtue

3    or possession of firearms in his case.

4        He can be seen on many videos brandishing and holding

5    firearms, and he is photographed with firearms and when taken

6    in conjunction with the aggressive threatening statements he

7    makes, I think it makes clear that he poses an ongoing threat

8    if released to community safety.

9        The Court should also know that at the time the refuge was

10   essentially disassembled and evidence was received and

11   examined, in Mr. Fry's car agents discovered five guns and a

12   significant amount of ammunition; one shotgun and four separate

13   rifles, with ammunition for them all, in his car.  And this is

14   in addition to the firearms that he had access to on the refuge

15   itself.

16       So this was not a de minimis access to firearms.  It was a

17   willingness to possess them in an ongoing concerted way.

18       So that really speaks, I think, to the nature and the

19   circumstances of the offense and the weight of the evidence,

20   and those go both to support the government's position related

21   to danger and flight.

22       Briefly, Your Honor, I would like to speak really to his

23   characteristics and his history as an individual because that's

24   really what the pleading that Mr. Olson has offered the Court

25   speaks to as well.

1     Addressing some of those factors, the government doesn't

2   dispute the general existence of strong family ties to Mr. Fry.

3   That's laid out very clearly in Mr. Olson's motion.  We don't

4   dispute that at all, nor do we wish to overstate the criminal

5   history.  I think it's relatively minor; however, it speaks

6   generally -- the criminal history does -- to an inability to

7   follow specific directions or to get things done.  And why that

8   matters and why that should matter to this Court, when taken in

9   conjunction with other factors, is you have before you someone

10  who has not demonstrated an ability to follow directions, and

11  that matters for today's purposes.

12     Finally, Your Honor, I'll speak to, I think, the most

13  relevant concern as it relates to the history and

14  characteristics of this offender, and that is what is clearly

15  an acute mental health issue.  A report has been presented to

16  the Court and to the government by the examiner on behalf of

17  the defendant.  Dr. Guyton identifies the issue not as being

18  one of schizophrenia; however, acknowledges that he's

19  previously been diagnosed.  I think the Court can take away two

20  important things.  Regardless of whether it accepts at face

21  value the information proffered by the defense, one is there

22  clearly is a mental health issue here; and the second is there

23  is no plan in place to address it.  The defendant has

24  represented a repeated unwillingness to take any sort of mental

25  health or psychotropic medication.  He may have reasons for

1    that, but the important thing that should matter to this Court

2    is an unwillingness to do so would be at direct odds with

3    pretrial's recommendation that he do so and injects that

4    critical element of unpredictability into any decision

5    regarding release.  And I think when you take those factors

6    into consideration, the mental health issue, coupled with the

7    facts underlying the offense, and, most critically, with the

8    unpredictable desire of this individual to inject himself into

9    a situation thousands of miles from home, with firearms, means

10   that there are simply no conditions that could assure either

11   compliance with pretrial supervision, his appearance, or really

12   the safety of the community in any reliable manner going

13   forward.  And, for that reason, we urge the Court to adopt

14   pretrial's recommendation and continue to detain Mr. Fry

15   pending trial in this case.

16          THE COURT:  Thank you, Mr. Knight.

17      Mr. Olson, I would like to hear from you.  And I want to

18   let you know, for the record, I have reviewed your motion for

19   release, as well as the entirety of the confidential mental

20   health evaluation.

21          MR. OLSON:  Thank you, Your Honor.  And I probably

22   won't discuss it much in detail, but since Mr. Knight touched

23   on it, I think I'll start there, with that report.  And I can't

24   stress enough that this whole issue of taking psychotropic

25   medication is simply not before the Court.  This is absolutely

1   not an issue whatsoever.  This was a question that was asked of

2   Mr. Fry in his Pretrial Services interview, by Mr. Nischik,

3   what his feelings were about that, whether he would agree to

4   take psychotropic medication, and he stated his objection to

5   that.  And as the conversation went on, he stated that it,

6   well, kind of depends on what the medication is.

7        But here's the bigger picture:  He's never been prescribed

8   such medication.  He's not currently under a prescription for

9   it.  No one has ever told him he should take it, except for

10  that doctor back in 2009.  And Dr. Guyton, who has done a very

11  thorough analysis of this individual, on very short notice,

12  does not believe that this is necessary.

13       So it's a complete moot point to say that he is a risk to

14  the community or a flight risk because he refuses to take the

15  psychotropic medications.  No one has prescribed that, and we

16  believe no one will.  And the reason they won't is if you look

17  at the psychological evaluation is that he's not diagnosed with

18  a -- a psychological condition that would call for that.

19       There's no diagnosis here of psychopathy or a sociological

20  problem that could be treated potentially by that form of

21  medication.  So to say that he refuses to take psychotropic

22  meds is kind of like saying he refuses to be subject to, you

23  know, electrotherapy or something.  It's just simply not before

24  the Court, and it's not an issue that anyone is really faced

25  with.

1        Now, what he has -- he does have a history of some mental

2   health issues.  There's no question about that.  And what

3   Dr. Guyton, though, has arrived at is that without making the

4   specific recommendation as to whether he can be released or

5   not, Dr. Guyton basically says that there are a set of

6   conditions that the Court can look at to -- to control or to

7   minimize any potential risk that might happen to the community.

8        And one thing that has not been tried in Mr. Fry's history

9   is mental health counseling, which is simply going to a

10  counselor and talking about other strategies that he might

11  employ to deal with some stressful situations.  He, in the

12  past, has used marijuana to deal with those sorts of

13  situations, and he understands that that's not a possibility

14  here.

15       So it's just simply a red herring to talk about

16  psychotropic medications.

17       Now, I also take issue with the comment that he is unable

18  to take specific direction from authority, and we'll get to the

19  offense conduct here in a moment, but his current PO, who I've

20  spoken to -- I understand Mr. Nischik hadn't been able to get a

21  hold of her, but she reports and would report that he has been

22  compliant with the terms of his probation and that she will not

23  take any action if he's able to come back to -- to Ohio.

24       So there is -- there was a reckless -- or, excuse me, a

25  resisting arrest charge.  He was acquitted of that last year.

1    If Your Honor is interested, I have video footage from the

2    dash-cam that shows that whole incident.  It shows, I believe,

3    an officer assaulting him, basically.  And so we can present

4    that to the Court if it becomes a matter of interest.

5        Your Honor, I want to back up.  So let me just sort of

6    talk about what I was going to talk about initially, which is

7    just a set of conditions that I believe are -- are suitable and

8    appropriate to assure this man is not a flight risk and he's

9    not a danger to the community.  I've talked about mental health

10   treatment.  I've talked about no marijuana and drug testing for

11   that.  There's guns in the home.  Those need to be removed.

12   He'll have to surrender his passport.  And obviously he can't

13   have any contact with the other co-defendants.  And he's got a

14   job lined up for him at his father's dental office.  I did

15   mention electronic monitoring.  I don't believe that that is

16   necessary, given the -- I don't believe that he is a flight

17   risk, but if the Court were to order that or if the authorities

18   in Ohio wanted him to be on electronic monitoring, I wouldn't

19   object to that.

20       Now, the reason that these conditions are sufficient is

21   because in addition to all of those conditions he's got a very

22   strong -- very strong layer of community support there in Ohio.

23   He's got people who love him, people who support him, people

24   who can watch over him and assure that he stays on the right

25   path and remains compliant.

1    And, you know, what -- the chronology here that the -- the

2    offense conduct -- conduct that has been described here by the

3    government overlooks a very key event in the chronology of

4    things that occurred at the -- in Eastern Oregon; that being

5    the shooting death of LaVoy Finicum.

6    And this was a point that I tried to make in my

7    memorandum, is that there is a stark contrast of what you see

8    with the defendant before that point in time and then what you

9    see after that point in time. And what Mr. Knight has

10   described is everything that happens after that point in time.

11   He did not go to the refuge with a firearm. There's no

12   evidence that he did, and he did not. The possession of the

13   firearm came after the death of Mr. Finicum, where those who

14   remained were incredibly fearful, including Mr. Fry; incredibly

15   fearful of what might happen to them. Are they going to be

16   suffering the same sort of fate that Mr. Finicum did?

17   So in regards to statements that he made, things that were

18   seen in the video, I would ask the Court to consider those

19   statements within the framework of that grip -- that fear that

20   gripped that small community that remained. And you can see

21   it. You can see it -- you can hear it in the voices. You can

22   see it in their eyes. That's what was going on there. And all

23   the way up to the end, when Mr. Fry had to be talked back from

24   the brink, when he was threatening to kill himself, that was

25   every bit what was going on at that point in time.

1       He put the firearms -- they were left -- that were left

2  behind by others when they left.  He put those in the car for

3  safety reasons.  He wasn't intending to claim those.  Those

4  were laying kind of scattered about when people left.

5       They then moved to this camp, if you will, in the parking

6  lot, and he just simply put those firearms in there, so -- but

7  he is seen carrying a firearm.  And I would submit, Your Honor,

8  there was a tremendous amount of fear that was running through

9  those individuals.  And Mr. Fry, so many miles from home, kind

10  of a cold and desolate place, sleepless, and he -- he simply

11  was not thinking clearly throughout that whole time period.

12       So I would ask the Court to consider that, and, you know,

13  there's -- we haven't -- I'm at a bit of a disadvantage here,

14  Your Honor, because we haven't received any discovery in this

15  case.  Supposedly, it's coming this afternoon.  There's been

16  some delays, but, then again, so much of it is available at our

17  fingertips.

18       Mr. Fry tells me that in the days leading up to his arrest

19  he was on the phone regularly with an FBI negotiator, and he

20  told that FBI negotiator -- and this is not something that I

21  believe can be live-streamed or is any -- on any of the

22  publicly available websites -- that he did have a lot of anger,

23  but he was not specifically targeting the FBI and he had no

24  intention of killing an FBI agent.  He didn't want to do that.

25  Most of the comments that you hear from him that are most

1    startling and most scary, frankly are threats of self-harm; not
2    of harming others.  He was in an incredibly stressful situation
3    there, but he made clear to those FBI agents that he had no
4    intent of assaulting them.

5         So, again, Your Honor, this -- this, with LaVoy Finicum's
6    death and the confusion, and just the terror, I think, that was
7    running through this camp, that was a very important point in
8    time that kind of marked Mr. Fry beforehand and after --
9    afterwards.  He was posting things before that were kind of
10   lighthearted in nature, and things got very dark thereafter.

11        And so the reason all of this is relevant is that, you
12   know, when we -- when we want what's best for Mr. -- for the
13   community, as well as for Mr. Fry, between now and trial --
14   which who knows when that's going to be at this point -- I
15   believe he is better off, in terms of avoiding stress and being
16   in a comfortable environment around people who love him.  He
17   will be far better off in his home environment where he's
18   surrounded by those people, as opposed to a jail where he's
19   surrounded by strangers.

20        And I'll say actually he's been doing pretty good in jail.
21   It's not nearly as bad as he thought it might be; but, you
22   know, the -- the -- how far out this trial might be is yet
23   another factor, though, in considering what's best for -- for
24   not only this person, but what's best for the community.

25        We don't know when it's going to be.  Given all the

1 defendants in the case, we don't know what potential sentence

2 he might be looking at if he is convicted of something. So it

3 could be a long -- it could be a long wait before he's

4 ultimately tried in this matter, if he is held here in the

5 Multnomah County Jail rather than allowed to go home and to try

6 to get his feet underneath him in a safe environment.

7 So, Your Honor, there's a lot of hyperbole out there, and

8 it's understandable, given what's available on the Internet.

9 I do want to stress, though, that in talking to his -- his

10 family and getting these letters from people, this is a person

11 who has tremendous character in the community there. He is

12 somebody that you can talk to and instantly take a liking to.

13 And I think that's demonstrated in a lot of those videos that

14 occurred early on especially. And he has a way of, you know,

15 making friends wherever he goes. And just given his overall

16 character, I believe he is very, very much amenable to

17 supervision and that he's not a flight risk. He's not a risk

18 to the community that can't be ameliorated in some way with

19 these conditions.

20 So I would ask the Court to release Mr. Fry and that a

21 referral be made to the Southern District of Ohio, where

22 Pretrial Services -- I haven't reached out to them, but that

23 would have to be a step to supervise him. That's what we ask.

24 Thank you, Your Honor.

25 THE COURT: Thank you, Mr. Olson.

1    First, I would like to commend Mr. Olson for doing a very

2    thorough job in painting a more complete picture of Mr. Fry.

3    I've read every letter that's been written on his behalf, as

4    well as reviewing the entirety of the lengthy mental health

5    evaluation, and I appreciate the efforts you took to educate

6    the Court.  The four factors that the Court must consider in

7    determining whether this defendant is a good candidate for

8    release are, first, the nature and circumstances of the

9    offense; second, the weight of the evidence; third, the history

10   and characteristics of the person, including, among other

11   things, mental condition, past conduct, history of drug abuse;

12   and, fourth, the nature and seriousness of the danger to any

13   person or to the community if this person is released.  And

14   I've carefully considered each of those factors, and I concur

15   with the recommendation of the Pretrial Services officer that

16   the defendant should be detained pending trial, both on the

17   grounds that he presents a risk of nonappearance and a risk of

18   danger to the community.

19       And I'll go into some detail of my thinking, for Mr. Fry's

20   benefit, because I will note that Mr. Olson has identified many

21   positive attributes of the defendant's character, and there's

22   no doubt that he has a stable, loving family and that there are

23   some very positive things about his character.  However, when I

24   looked at these four factors, I believe all four of the factors

25   weigh toward detention here.  First, as to the nature and

1   circumstances of the offense, as we've discussed during several

2   other appearances of Mr. Fry's co-defendants, this offense was

3   incredibly dangerous and created a very dangerous situation for

4   the people of Harney County, as well as the law enforcement

5   officers who were there trying to keep everybody safe and save

6   lives.  In addition to the nature and circumstances, I believe

7   that this particular defendant's role in the offense prolonged

8   it and made it very dangerous during the final days of the

9   offense.

10      Regarding the weight of the evidence, I believe it's very

11  strong.  The community watched the offense take place through

12  social media and traditional media coverage.

13      And with regard to the history and characteristics of

14  Mr. Fry, I'm not going to go into the confidential aspects of

15  the mental health issues, but I will note for the record that

16  there are some areas of concern, including Mr. Fry's past

17  interactions with law enforcement, the history of marijuana

18  use, which was not legal in the state in which he resided in.

19  I'm concerned about the episode in the hospital that occurred

20  in 2009, the episode that occurred while he was previously

21  incarcerated; concerned about his anger and how he has

22  expressed anger throughout his adult life; concerned with the

23  mental health issues that are discussed and the mental health

24  evaluation.  I'm concerned with his possession of firearms on

25  the refuge.  I'm also concerned that he committed the instant

1   offense while on probation for another offense.  And while I

2   don't have any information to believe that he violated the

3   conditions of his probation by traveling to Oregon -- maybe he

4   did.  I don't know -- but he certainly violated the conditions

5   of his probation by committing -- allegedly committing a new

6   offense.  And I think based on his own statements he knew he

7   was breaking the law at the time.

8       The fourth factor is the nature and seriousness of the

9   danger to any person in the community if I were to release

10  Mr. Fry.  And I believe -- based on all these factors I just

11  discussed, I do believe that there is a serious risk to the

12  community, in particular to law enforcement, if Mr. Fry is

13  released at this time.

14      For all of those reasons, I'll make a finding that the

15  defendant presents a risk of nonappearance and a risk of danger

16  to the community if he were to be released.

17      Mr. Olson, with regard to the issue of discovery, you're

18  in a difficult spot trying to seek release without discovery.

19  And, certainly, I'll just note that you have a right to appeal

20  my decision to Judge Brown, the assigned judge to the case,

21  either before or after receiving the discovery, and so

22  hopefully that will alleviate that concern for you.

23      I'll just note, for the record, there is a trial date

24  currently set.  It sounds like Judge Brown is going to hold the

25  government to -- not to that date, but to a date sooner than

1    what they asked for.  It's currently set for April 19th.  I'll

2    also note there's a status conference set for next week,

3    March 9th, at 9:00 a.m., before Judge Brown.

4         Mr. Olson, anything further at this time?

5              MR. OLSON:  No, Your Honor.  Thank you.

6              THE COURT:  Okay.  Thank you.

7         Mr. Knight, anything further?

8              MR. KNIGHT:  No.  Thank you, Your Honor.

9              THE COURT:  Thank you.

10                        (Hearing concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3              United States of America, v. David Lee Fry

4                        3:16-cr-00051-BR(13)

5                     CONTINUED DETENTION HEARING

6                          March 4, 2016

7

8              I certify, by signing below, that the foregoing is a

9    true and correct transcript of the record, taken by

10   stenographic means, of the proceedings in the above-entitled

11   cause.  A transcript without an original signature, conformed

12   signature, or digitally signed signature is not certified.

13

14   /s/Jill L. Jessup, CSR, RMR, RDR, CRR

15   _____

     Official Court Reporter        Signature Date: 4/1/16
16   Oregon CSR No. 98-0346          CSR Expiration Date:  3/31/17

17

18

19

20

21

22

23

24

25

Per C. Olson, OSB #933863
HOEVET OLSON HOWES, PC
1000 SW Broadway, Suite 1500
Portland, Oregon 97205
Telephone: (503) 228-0497
Facsimile: (503) 228-7112
Email: per@hoevetlaw.com

      Of Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>     v.<br><br>DAVID LEE FRY,<br><br>      Defendant. | Case No. 3:16-CR-00051-13-BR<br><br>DEFENDANT'S MOTION FOR RELEASE FROM DETENTION |

    Defendant, David Lee Fry, through his attorney, Per C. Olson, hereby moves for release from detention pursuant to 18 USC § 3142. This matter is scheduled on the magistrate's calendar for March 4, 2016.

**Introduction and Release Plan**

    Defendant is neither a flight risk nor a danger to the community. Defendant proposes that he be released from custody on the condition that he return to his home in Blanchester, Ohio, and, upon acceptance, that he be supervised by Pretrial Services in the Southern District of Ohio. Defendant is willing to comply with all reasonable conditions of supervision designed to assure the protection of the community and defendant's appearance in court, including surrender of his passport, mental health

HOEVET OLSON HOWES, PC
ATTORNEYS AT LAW
1000 S.W. BROADWAY, #1500
PORTLAND, OREGON 97205
(503) 228-0497

counseling, abstinence from all drugs including marijuana, drug testing, and resuming work.

In support of this motion are attached letters from friends and family in Ohio who can attest to defendant's connection to the community there and to his character. The letters are from:

- William and Sachiyo Fry (parents)
- William R. Fry, Sr. (grandfather)
- Shirley Fry (grandmother)
- Derek A. Fry (uncle)
- Judy Fry (aunt)
- Michele Ewing (aunt)
- Nicholas Burlile (friend).
- Tucker Shelton (friend)
- Nicole Ewing (cousin)
- Warren and Karen Shelton (friends)

Additional information regarding Mr. Fry's mental health will be submitted to the court *in camera* or under seal.

### Legal Standards

18 USC § 3142 provides that any person charged with a federal offense shall be released unless a "judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." § 3142(e)(1). The court must impose the "least restrictive" combination of conditions designed to assure those twin goals. § 3142(c)(1)(B). If the government seeks detention, it bears the burden of proving by clear and convincing evidence that "no condition or combination of conditions will reasonably assure the safety of any other person in the community." 18 USC § 3142(f)(2). Or, it must prove

Page 2 – DEFENDANT'S MOTION FOR RELEASE FROM DETENTION

HOEVET OLSON HOWES, PC
ATTORNEYS AT LAW
1000 S.W. BROADWAY, #1500
PORTLAND, OREGON 97205
(503) 228-0497

that he is a flight risk by the "clear preponderance of the evidence." *Lopez-Valenzuela v. Cty. Of Maricopa*, 719 F3d 1054, 1065 (9th Cir. 2013), *citing United States v. Motamedi*, 767 F3d 1403, 1406 (9th Cir. 1985).

18 USC § 3142(g)(3) requires that the court consider a number of factors when determining "whether there are conditions of release that will reasonable assure the appearance of the person as required and the safety of any other person and the community." These factors include the "nature and circumstances of the offense charged," "the weight of the evidence against the person," and "the history and characteristics of the person," defined to include "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings."

### History and Characteristics of the Person

Mr. Fry comes from a proud military family. His father, grandfather, four uncles, and brother all served in the United States Marine Corps. Mr. Fry's father, William Fry, was a gunnery sergeant stationed at the Marine Corps base in Iwakuni, Japan, when he met defendant's future mother, Sachiyo, then a citizen of Japan. William returned to the states with Sachiyo, and Mr. Fry was born in Yuma, Arizona, where William was stationed. Mr. Fry and his older brother also spent childhood years in California.

When defendant was about 14, his father retired from the military, having served the full 20 years. At that time, William moved the family to his home state of Ohio. They settled in Blanchester, Ohio, where he and Sachiyo have lived for about 13 years. William is the owner of a company that manages a dental practice. Sachiyo works at the same office, filling cavities. Defendant's older brother, Daniel, lives in Oceanside, California, with his wife and two kids. Many members of David's extended family, including grandparents, aunts and uncles, and cousins, live close by in Ohio.

Page 3 – DEFENDANT'S MOTION FOR RELEASE FROM DETENTION

Defendant is now 27 years old. He has lived with his mother and father in Blanchester since they moved there, with the exception of about a year when he attended college in a different town. Defendant graduated from high school, and has also accumulated about three years of college credit at the University of Cinncinnati-Claremont and Wright State.

David has worked at his father's dental practice almost continuously since he was 15 years old. Before he came out to Oregon, he was working full time at the clinic as a technician, cleaning utensils, making retainers, and assisting with patients. If released, he would return to work at the clinic pending trial in this matter.

The court must consider defendant's "character." Mr. Fry is a person who cares deeply about other people and about animals. He regularly gives to several charities, including the Salvation Army, the American Red Cross, and PetSmart (a pet store retailer that has a program for abandoned pets). He has several pets of his own who he left in his parents' care in Ohio. He also has gathered together blankets to give to homeless people in Japan when he has visited his mother's family there. (See William Fry letter). He helps out his neighbors by helping them build their house and make maple syrup, asking nothing in return. (See Warrant and Karen Shelton letter).

The letters of support portray a person who is very loyal to his friends, family, country, and his faith. His friend since adolescence, Mr. Burlile, describes Mr. Fry as someone who would befriend and stand up for kids considered outcasts. Mr. Fry encouraged others to do the right thing and to be honest. David sometimes was shunned in his small community for being a Japenese American, but his loyalty to his country has never wavered.

Both his aunt, grandmother, and others describe defendant as very helpful and caring. He helps out friends and family with fixing bugs in their computer systems without expecting anything in return. His aunt, who also works at the dental practice,

HOEVET OLSON HOWES, PC
ATTORNEYS AT LAW
1000 S.W. BROADWAY, #1500
PORTLAND, OREGON 97205
(503) 228-0497

describes him as quite conscientious with his work responsibilities and in assisting the patients. His aunt says he was a "loving and compassionate child and his compassion for the things important to him has carried on into his adult life." Mr. Fry is a spiritual person. He frequently discusses the Bible and biblical passages with his grandmother, Shirley Fry. He considers himself a Messianic Jew.

In sum, although Mr. Fry has had some tangles with the law (see below), he does not have a criminal or violent disposition. Rather, he is a solid and giving member of his community; he is very empathetic for others, especially the powerless; he is very passionate about his opinions and what he cares about; and he is loyal to his country, his faith, and his friends and family.

**Prior Convictions**

Defendant's prior convictions do not give rise to a concern for flight risk or danger to the community. In 2008, he and a friend were smoking marijuana in a park when they were approached by a police officer. Defendant tossed the pot pipe away as the officer approached. The officer did not see defendant toss the pipe; rather, defendant admitted to doing this because he was concerned that a small child might find it. This admission led to a charge of Tampering with Evidence, but that count was dismissed, and defendant instead was convicted of misdemeanor counts of possession of marijuana and drug paraphernalia.

One afternoon in September of 2014, defendant was floating down the Little Miami River in an inflatable raft near his home in Ohio when he was summoned to the shore by an officer with the Ohio Department of Natural Resources, Watercraft Division. The officer warned defendant that, because his boat had three air chambers, Ohio law required that it be registered. The officer also cited defendant for not wearing a life jacket in the shallow river. The officer sought consent to search defendant's bag, and defendant refused. However, after being told that a K-9 unit would be brought to the

Page 5 – DEFENDANT'S MOTION FOR RELEASE FROM DETENTION

HOEVET OLSON HOWES, PC
ATTORNEYS AT LAW
1000 S.W. BROADWAY, #1500
PORTLAND, OREGON 97205
(503) 228-0497

scene, defendant admitted that he had pot and a pot pipe in his bag.  He was ultimately found guilty again of possessing marijuana and drug paraphernalia.

In January of 2015, defendant was driving to a location to perform his community service obligation.  His license was suspended as a result of the 2014 conviction, but he had a letter from the judge permitting him to drive for limited purposes.  The vehicle had a faulty tail light, and so defendant connected a string of Christmas lights to the electrical system and hung it from his trunk as an alternative way of illuminating his rear.  An officer, unimpressed with this ingenuity, pulled him over.  Unfortunately, defendant did not have the letter from the judge extending driving privileges.  He asked the officer to call the court to confirm, but the officer refused to do so.  Defendant attempted to open the door to his car, and the officer pushed it closed.  Defendant's foot was in the door jam, so he instinctively pushed back.  In a very short span of time, the two can be seen on the officer's dash cam pushing opposite directions on the door.  The officer then opened the door and violently pulled defendant from the vehicle and slammed him repeatedly against the exterior of the car.  Defendant went to a jury trial, and was convicted of Driving While Suspended and Obstructing Official Business, but was acquitted of the Resisting Arrest charge.

The bail report shows two failures to appear in court in 2014 and in 2015.  Both warrants were cleared up quickly.  The docket in the 2015 case indicates that defendant's failure to appear was caused by a miscommunication with his attorney.

Defendant has had no probation violations.  He presently is on probation for the 2015 matter.  Counsel for defendant has contacted defendant's probation officer in Ohio, and she reports that defendant has been in compliance with the terms of his probation since his conviction in June of 2015.  (The PO's contact information has been provided to Pretrial Services).  This compliance includes periodic reporting.  The PO also reports that, if defendant were to return to Ohio on pretrial release in this matter,

HOEVET OLSON HOWES, PC
ATTORNEYS AT LAW
1000 S.W. BROADWAY, #1500
PORTLAND, OREGON 97205
(503) 228-0497

she would not take action with regard to a new law violation unless and until defendant
were to be adjudicated guilty in this matter. She suspects that defendant's probation
will expire before that happens. Thus, there is no risk that defendant will be taken into
custody in Ohio on a probation violation if he is permitted to return there.

In sum, defendant's priors do not reflect that he is a flight risk or danger to the
community. They largely stem from defendant's possession and use of marijuana. He
understands that he will not be permitted to use marijuana in any form while on pretrial
release, and he is willing to abide by that condition. There is not a history of failures on
probation.

### Nature and Circumstances of the Offense

Defendant is charged with a single count of a Conspiracy to Impede Officers of
the United States, 18 USC § 372, which carries no mandatory minimum sentence, and
a maximum penalty of only six years imprisonment. This offense does not have an
assigned sentencing guideline provision. In that circumstance, courts look to the most
analogous guideline section. Here, USSG § 2A2.4, entitled "Obstructing or Impeding
Officers," clearly is the most analogous. It calls for a base offense level of 10 and no
more than 5 additional points for specific offense characteristics. Thus, despite the
notoriety this case has received in the press, the offense charged is not in the category
of most serious federal crimes.

With regard to Mr. Fry's specific involvement in the alleged conspiracy, he was
not part of the initial occupation of the Malheur Wildlife Refuge which commenced on
January 2, 2016. In fact, he was at home in Ohio at the time. Rather, he arrived at a
later time. Notably, the affidavit in support of the criminal complaint, dated January 26,
2016, does not mention Mr. Fry. His precise motives for coming to Oregon likely will be
sorted out at a later time. His father, William Fry, describes him as someone who

Page 7 – DEFENDANT'S MOTION FOR RELEASE FROM DETENTION

speaks out "about the many problems in the world," and William surmises that his son saw Malheur as a place "where the world was listening."

A partial portrayal of Mr. Fry's activities at the Malheur Refuge is conveniently available on his YouTube channel, DefendYourBase. ("Defendyourbase" was devised as defendant's video game user name). The first published video from Oregon is dated January 9, 2016, and his last is just before his arrest. The first batch of videos are varied in subject matter and light in tone. They include nature clips showing defendant's curiosity with the local wildlife, such as quails and squirrels. A few clips show defendant exploring a number of books that people had sent to the occupiers. One such book was the Quran. A video depicts Mr. Fry reading the Quran and highlighting a passage that debunks the idea that it calls for violence against Christians and Jews. Another video shows children singing Amazing Grace. Another set of videos shows Mr. Fry poking fun at critics from the outside who thought the occupiers were white separatists. It shows a young black man having a friendly chat with LaVoy Finicum at the Refuge.

The tone of the videos shifted markedly after Mr. Finicum was shot and killed on January 26. Mr. Fry had befriended Mr. Finicum in their short time together, and he was shocked and deeply saddened by his death. Fear took ahold of those who remained at the Refuge, including Mr. Fry. They feared that law enforcement would use violence to end the protest. Whereas before Mr. Fry's tone was light and friendly, his voice now was variously hushed, scared, and angry, reflecting his underlying fear.

Mr. Fry and three others – Sean and Sandra Anderson and Wayne Banta – became the last four remaining persons at the Refuge. In a show of good faith, they abandoned the refuge buildings and made camp in the parking lot.

The government likely will highlight defendant's conduct and statements during this period as reflecting poorly on his amenability to supervision and his risk of danger to the community. However, the court is asked to consider defendant's circumstances at

HOEVET OLSON HOWES, PC
ATTORNEYS AT LAW
1000 S.W. BROADWAY, #1500
PORTLAND, OREGON 97205
(503) 228-0497

the time – fearful that he would meet the same fate as Mr. Finicum; far from home and loved ones; cold and sleep deprived; and somewhat desperate. Also, we note that the court has ordered the release of Sandra Anderson and Mr. Banta, with conditions.

Defendant ultimately surrendered to the FBI when it closed in. In the hour or so leading up to his arrest, defendant voiced a desire to kill himself. As he explained to law enforcement, a different fear gripped him at that point – that of being sexually assaulted by other inmates in prison. This was not a completely unreasonable fear. Several people had posted comments on his YouTube channel that he likely would be raped by other inmates once he was taken into custody. Whether those posts were made in jest, defendant took them seriously, as he has a small frame and long hair. This fear, and the accumulated stress that had been building in the preceding weeks, pushed defendant to the brink. To everyone's relief, he came back from the brink and surrendered without incident.

Understandably, the jail authorities put defendant on suicide watch for the first couple days. He was then placed in segregation for a period of time, but has incrementally earned his way down the levels of security at the Justice Center jail. This demonstrates his ability to abide by rules and earn the trust of those supervising him.

**Nature and Seriousness of Danger**

Finally, the court must consider "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." Defendant submits that he does not pose a risk of danger to any person or the community. As the court can glean from the many letters of support, he is not, by his nature, a violent person. Indeed, his faith and philosophy condemn the idea of doing harm to others. To the extent that defendant's past gives rise to any risk of danger, that risk can be ameliorated with an appropriate set of conditions.

HOEVET OLSON HOWES, PC
ATTORNEYS AT LAW
1000 S.W. BROADWAY, #1500
PORTLAND, OREGON 97205
(503) 228-0497

**Conclusion**

For the foregoing reasons, defendant respectfully submits that the government cannot meet its burden of establishing by clear and convincing evidence that there are no set of conditions that can sufficiently ameliorate any risk of danger to the community posed by defendant's release to pretrial supervision.  Also, the government cannot prove that defendant is a flight risk.    He should be released on conditions the court deems appropriate.

DATED this 4th day of March, 2016.

_s/ Per C. Olson_____
Per C. Olson, OSB #933863
Attorney for Defendant David Fry

HOEVET OLSON HOWES, PC
ATTORNEYS AT LAW
1000 S.W. BROADWAY, #1500
PORTLAND, OREGON 97205
(503) 228-0497

March 3, 2016

To: The Honorable Stacie Beckerman, Magistrate Judge

From: William R. and Sachiyo N. Fry Jr.

Subj: Statement of Support, David Fry


Dear Judge Beckerman,

We would like to share with you our thoughts on David's potential pre-trial release. David has an entire family support structure, both direct and extended, as well as many close family friends and all of them love and care about David. David still lives at home and works in our family dental office.

David has a full time job still waiting for him serving the underserved children and families in our local and extended geographic area. Our office is one of the very few that will accept Medicaid and as a result people drive up to two hours to be seen in our office. To say that we are busy would be an understatement, some days we are simply overwhelmed. David has become a vital link in supporting that effort by maintaining and repairing our equipment, providing technical support for our computer systems, operating all of the sterilizers, assisting the doctors with patients and he is licensed to take and develop x-rays.

We DO NOT feel that David is either a flight risk or a risk to himself or our community and we would be willing to ensure his presence when requested. We understand this would require some level of financial burden and we are willing to take that on. David can contribute if he is able to work. David has never been a violent or hateful person but he has been subjected to it throughout his life in the form of racism. Having suffered this type of hatred he simply does not act this way. David has developed a unique sense of humor with a shock jock approach that he uses to effectively defend himself from this hatred and at other times. I hope that you take a close look at any statements that he has made to discern whether he was, at times, using "this" approach to the situation presently before your court.

One of the local news reporters covering this event created a headline that accused David of being an "ISIS Supporter" and "Hitler Acolyte" because of this shock jock approach of David's. Long story short, someone on the internet was claiming we needed to kill the Muslims. David attempted to get this comment removed by the host of the site but they would not remove the comment so he showed the person making those comments what it looks like from "the other side" by saying "pray for ISIS" and other comments. This still did not get the other person to remove their comment about killing Muslims and David never removed his comment. The news reporter found those comments and took them out of

**Attachment A - Page 1 of 12**

context and made an outlandish head line from it. That is not David's beliefs of the head or the heart and no, David is not Muslim so he was not protecting his own. He was simply defending his fellow man.

David has traveled to Japan nearly every year of his life but the reason for those trips, his grandmother, passed away in August of last year. During the yearly winter trips, Sachiyo, my wife and David would have to travel thirty grueling hours by car, plane and train to get to grandma's house. Japan has a large homeless community since the financial collapse in 1990 that has only gotten worse with additional more recent financial problems. On those trips when David would get to the train station, nearing the 30 hour mark and late in the evening, he would hand out blankets to the homeless sleeping in cardboard boxes, freezing, inside the train station. David has always had a big heart, no one asked him to do this but at a young age he simply saw the problem and began to take the initiative, every year, to do something about it. His comments were "at least they have a blanket". Friends, neighbors and family could all tell you additional stories about David's kindness.

So before you is our son, a shy, kind hearted 27 year old kid who saw an opportunity to speak out about the many problems of our world in a place "where the world was listening" but it has turned into a nightmare to say the least. I hope that you will consider relieving some of that nightmare by extending the opportunity for pre-trial release for David.

I thank you for your kind consideration in this matter and if there are any questions please call Bill at ▓▓▓▓▓▓ cell.


Respectfully submitted,


William and Sachiyo Fry

Magistrate Judge Stacie Beckerman

SUBJECT :LETTER OF SUPPORT FOR MY GRANDSON DAVID FRY.

DAVID IS A HARD WORKER AND GAINEFULLY EMPLOYED AS A DENTAL TECHNICIAN.
DAVID IS A YOUNG MAN WHO IS VERY INTERESTED IN COMPUTER SYSTEMS AND READING SPIRITUAL
MATERIAL.

HE COMES FROM A FAMILY OF CAREER MARINES HAVING A FATHER, BROTHER, 4 UNCLES, AND A
GRANDFATHER THAT HAVE SPENT MORE THAN 150 YEARS OF HONORABLE MARINE CORPS SERVICE,

WE ARE DISSAPOINTED THAT DAVID HAS GOT HIMSELF INTO THIS MESS, BUT I HOPE FROM THIS HE HAS
LEARNED A LESSON./ IT IS MY SINCERE OPINION THAT DAVID IS NOT A FLIGHT RISK AND I DO NOT FEEL
THAT INCARSERATION AWAITING TRIAL WOULD BENIFIT HIM OR THE US GOVERNMENT.

WE HAVE A CLOSE NIT FAMILY HERE AND GET TOGETHER FOR ALL HOLIDAYS AND BIRTHDAYS. DAVID IS
ALWAYS A PART OF THIS. WE ALL LOVE AND SUPPORT HIM AND WILL STRONGLY SUpPORT HIM
THROUGH THIS PERIOD OF HIS LIFE.

DAVID IS A VERY GENTAL YOUNG MAN WHO DOES NOT GIVE ME ANY REASON TO BELIEVE THAT HE IS A
THREAT TO HIMSELF AND/OR OTHERS

SINCERLEY
WILLIAM R FRY SR.
PAP PAP

Dear Magistrate Judge Stacie Beckerman,

My name is Shirley Fry and David is my grandson. I do not believe David would be a flight risk or hurt anyone in the community. David has always been such a help to me for keeping my computer running smoothly. I never had to wait days for him to help. When he would get off work (he worked every day in his dad's dental office) he would come over, fix it , but he would not take any money for helping although we offered to pay him. I know he has helped other family members and friends working on their computers and again would take no payment. We also had some great discussions on the Bible even if we did not always agree. He knows a lot about the Bible and where to find a passage to support his views. David could be counted on any time if we needed help moving things or any help that we needed. We would very much appreciate it if David could be released, pending his trial.

Thank you so very much.

3 March 2016

To: Magistrate Judge Stacie Beckerman

From: GySgt Derek A. Fry, USMC, Ret

Subj: REFERENCE LETTER FOR DAVID LEE FRY

David Fry is my nephew, the son of my Brother William Fry. I have known David since his birth, and have interacted with him consistently from that time. David has spent the vast majority of his life here in Ohio, living with his Father and Mother, and in close proximity to my family, my sister's family and our Parents. He works here and all of his friends are here. He really has no network outside of Ohio, and I really believe he needs this loving network around him. I see no reason or means of him becoming a flight risk.

David has been raised in an environment where there is much honor placed upon our great Nation. My dad, my brother and I are all retired Marines, and there are many other relatives who have served our country or are serving now, including David's older brother. There is no doubt in my mind that David's loyalty to this country is as strong as all of ours combined. It is easy for anyone to look at a day in David's life and form an opinion about him, but those that that have looked at David's entire life have a high level of respect for him.

David is a very soft-spoken, gentle person, deeply religious and extremely intelligent about our country's history and government. He is very knowledgeable in computers. The interesting part is that David has taken the time from his life to learn these on his own. To say he is unique is an understatement. There are many aspects of David's character that only surface with in depth conversation with David, something that I really admire about him since his outward appearance would give no indication he is like this.

**Attachment A - Page 5 of 12**

David has a very strong belief in God. As a retired Marine, I have seen much death in Bosnia and then Iraq. After I retired, I found it very difficult to pursue a once avid hobby of hunting. In many talks with David on the subject, he has always indicated a belief that killing or hurting a creature of God was absolutely unnecessary. I feel 100% certain that David is not a danger to himself or to anyone else on that matter. Again, this is based on personal observation and numerous conversations I have had with David over many, many years.

While I don't condone the actions of David that has led to his current situation, I do know who David is, I do know the wonderful and meaningful things that David believes in, and I do love and respect him very much for that. I respectively ask the court to please consider these things as well in all of David's future hearings, including David's release pending his upcoming trial.

Sincerely,

GySgt Derek A. Fry, USMC, ret.

March 2 2016

To Magistrate Judge Stacie Beckerman

My name is Judy Fry. I am David Fry's aunt. I am married to David's uncle Derek Fry. I met David in 2002 when Derek and I met. I am very proud to be part of the Fry family. I am proud of their support of one another. They are loyal to one another and have a good sense of what is right and what is wrong. I am proud of their service to our country.

I have been a registered nurse for 30 years. I have cared for many patients, many families with many differing backgrounds and cultures. I have seen the very bad and the very good. I feel I have a pretty good sense of a person's character. I met David when he was a teenager. David is and has always been a very sweet and kind person. David would never harm another person. He has a gentle soul. I have never heard David say a mean or hurtful word to anyone. He is not hostile or mean.

When I married his uncle we became a blended family. This was a change for the whole family and there were trust issue regarding my husband's previous wife. I wanted to be accepted by the family but I knew I had to earn trust. David was the first of the nieces and nephews to call me Aunt Judy (I had not asked). David let me know I was part of the family.

I ask you to allow David to be released pending his trial. David will be surrounded here by family that love him and would ensure he keeps his legal commitments. David's only income has been working in his family's business working side by side in the office with his parents and his aunt. I hope you will allow David to return to his home in Ohio pending his trial with his family that loves and will care for him.

Thank you for your time

Judy Fry

Dear Magistrate Judge Stacie Beckerman,

 I am writing you this letter on behalf of my nephew David Fry. I have known David all of his life and have been a part of his everyday life the last 18 plus years. David was a loving and compassionate child and his compassion for the things important to him has carried on into his adult life. He is compassionate about his faith, family and country. He has been a huge help to me personally with my inability to grasp "computer technology". He has built a personal computer for me and keeps my computer running smoothly by keeping it updated and clean from bugs and viruses. He never complains when I call him for help even if it is an inconvenient time for him. I have also worked with David at a dental practice for 5 years where he was the sterilization coordinator. He showed real concern for his responsibility and he was always making sure things were done 100% so our patients were completely protected. In addition to sterilization David is responsible for the maintenance and repairs of the dental equipment and ordering of many of our supplies. He is extremely intelligent and efficient and financially frugal with business matters.

 David is always respectful to his family and friends. He still refers to me as "aunt Michele" and not ashamed to give me a hug anytime and to tell me he loves me. His loving nature extends to all of his family, especially to his grandparents. He recently lost his maternal grandmother and he was not ashamed to share his feelings of grief with us. I do not feel David would attempt to flee or hurt anyone. His heart is too big and his loyalty is too strong! Please consider releasing David pending his trial. He needs to be home with the love and support of his family and friends. Many of David's family have served and retired from the military including his grandfather, father, and uncle. Many other family members are still serving or have served. He understands his responsibility to the court and I feel there is no concern for flight. Thank you for your time and please send David home to us.


        Sincerely, Michele Ewing

To Whom It May Concern:

My name is Nichole Ewing. I am David Fry's cousin. David moved to Ohio (where I live) when I was in high school. He has always been very family-oriented.

David has strong feelings about the rights Americans should have, as stated in the Constitution. He is bothered when our country turns further and further away from a constitutional republic.

David is adamant in his beliefs and ideology, but in no way does he pose a harm to those around him. Additionally, he is not a flight risk, as his desire is to be around his family and his loved ones here in Ohio.

Thank you for your willingness to allow David to be around those who love him.

God bless,

Nichole Ewing

Administrator

Magistrate Judge Stacie Beckerman,

I have known David Fry by association for twelve years, same as the rest of my family. In the past 4-5 years I've gotten to know him more personally. From every experience I've had with him, I've left with nothing more than the usual passionate conversation he leads in most cases. He has always been very polite, and very ready to listen to whoever happens to be willing to contribute. He's honestly, always seemed entirely too polite, ( in a positive way).Even when at work, he always got along very well with everyone I saw him around. He's always seemed like a bright mind and maybe in some cases ahead of his kind, when it came to understanding people in general. I hope to help with David's circumstance, by giving you this letter in any way I can.

Thank You,
Tucker Shelton

Dear Magistrate Judge Stacie Beckerman,

My name is Nicholas Ryan Burlile. I am an active duty military member and I am writing this email to you today on the behalf of David Lee Fry.

I met David Fry in August of 2000, while we we were in 7th grade at Little Miami Junior High in Morrow, Ohio. We immediately became best friends and were inseparable throughout our school years into college. I have spent a wealth of time with David and his family. We are extremely close. David Fry is one of the most passionate and God fearing men I have ever had the pleasure of knowing. Throughout school, David was always befriending and sticking up for kids that were not popular and maybe considered outcast. David personally related to these people due to his own issues with being outcasted due to his heritage and being a minority. David always encouraged people to do what was right and be honest people. We grew up in a small town that was predominately caucasian but never once, even though he didn't fit in with most crowds and was shunned for being a Japanese American, did I ever believe David's loyalty wasn't to The United States of America. He loves this country and believes passionately in preserving its reputation and good name.

I write this email today to you Ma'am, requesting that David Lee Fry be released pending trial. I believe David is an upstanding citizen and after his release will show up for all court dates and will not pose any risk to the community or this great nation of ours. I believe that David has learned a valuable lesson throughout these past events and will continue serve this nation, only this time within his legal boundaries.

I want to conclude by thanking you for your time and service to our country.

Respectfully Sent,

Nicholas Burlile
Email:
Phone:

Magistrate Judge Stacie Beckerman,

We have known David Fry for 12 years. We, my husband and I, are not only friends of his parents, Bill and Sachyio, but my husband and Bill share a common bond. The Marine Corps. Our children and the Fry's have been raised to be honest, loyal, god fearing, American citizens, and to stand up for our country and its constitution. David has a strong sense of family and friendship values.

David has helped our family on numerous occasions. In the chaos of building our home, (January, February, and March), David was there lending a hand, in any way he could.

When we needed a website set up for our produce business, to inform the community of readily available fresh produce, David spent countless hours making it happen.

While our friend and neighbors wife was in hospice dying from kidney failure, David took on their daily chores so that they could spend their final days together.

While cutting and splitting wood for the process of making maple syrup we sale, David saw us and came out to help. Once again, asking for nothing in return, just being a good neighbor and friend.

Regardless of how he tried to portray himself in Oregon, he has never shown any aggressive or violent behavior, tending to take his opinions, and put them to words on the internet, not in physical confrontations.

David has made mistakes. We ALL have made mistakes, But we have never seen David run from, or refuse to admit to any of them. David is one of the few young men we know who is willing to debate his opinions and views reasonable, without losing his cool, because you may disagree with him.( We have six children 16-27, and they aren't nearly as cool in a disagreement.)

He has been a good friend and mentor to our younger sons. Willingly spending time playing video games with them, when I'm sure he would have rather been doing things with young people his own age.

Knowing David, we have no reason to believe he will not show for his trial, nor do we think that he should be incarcerated until that time. David believes I our country and our constitution, and we believe he will allow the criminal justice system to work accordingly.

With Respect,
Warren and Karen Shelton