No. 16-30174

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

PLAINTIFF-APPELLEE,

V.

DAVID LEE FRY,

DEFENDANT-APPELLANT.

CIRCUIT RULE 9-1.1 APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
THE HONORABLE ANNA J. BROWN, U.S. DISTRICT JUDGE (TRIAL JUDGE)
THE HONORABLE ROBERT E. JONES, SR. U.S. DISTRICT JUDGE (RELEASE DECISION)
D.C. NO. 3:16-CR-00051-BR-13

PLAINTIFF-APPELLEE'S RESPONSE IN OPPOSITION TO
DEFENDANT'S 9-1.1(A) MOTION

BILLY J. WILLIAMS
UNITED STATES ATTORNEY
DISTRICT OF OREGON
KELLY A. ZUSMAN
APPELLATE CHIEF
ASSISTANT UNITED STATES ATTORNEY
1000 SW THIRD AVENUE, SUITE 600
PORTLAND, OREGON 97204-2902
TELEPHONE: (503) 727-1000

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

Introduction ........................................................................................................... 1

Standard of Review ............................................................................................... 2

Argument

The District Court Correctly Sized Up Defendant; Fry is Impulsive and Volatile
and Poses an Insurmountable Risk of Danger and Non-Appearance at Trial ............. 2

Fry's Attacks on the District Court's Findings Should Be Rejected ............................ 6

Conclusion............................................................................................................... 9

# TABLE OF AUTHORITES
# FEDERAL CASES

*United States v. Fidler*, 419 F.3d 1026 (9th Cir. 2005)........................................................ 2, 3

*United States v. Hir*, 517 F.3d 1081 (9th Cir. 2008) ............................................................. 3

*United States v. Motamedi*, 767 F.2d 1403 (9th Cir. 1985)................................................... 2

*United States v. Santos-Flores*, 794 F.3d 1088 (9th Cir. 2015)................................................ 2

# FEDERAL STATUTES

18 U.S.C. § 2.......................................................................................................................... 1

18 U.S.C. § 372...................................................................................................................... 1

18 U.S.C. § 930...................................................................................................................... 1

18 U.S.C. § 3142 ................................................................................................................ 2, 3

# OTHER

David Speaks on Him being denied Pre-Trial Release (AGAIN), YouTube (July 14, 2016), http://www.youtube.com/watch?v=7PhEl8QW3MU&sns=em ............ 5

## INTRODUCTION

Defendant David Lee Fry was the final occupier to surrender to authorities following the armed takeover of the Malheur National Wildlife Refuge compound earlier this year. The events leading up to his surrender on February 11, 2016, are not in dispute; indeed, Fry recorded much of it and posted it on his own Youtube channel "Defend Your Base." Like many of the others, Fry was armed. Unlike the others, however, defendant resisted efforts to convince him to surrender by proclaiming that he would rather die than face prison rape.

Defendant stands charged with conspiracy to impede officers of the United States in violation of 18 U.S.C. § 372 and possession of firearms and dangerous weapons in federal facilities in violation of 18 U.S.C. §§ 930(b) and (2). The former charges carry a six-year statutory maximum penalty and the latter charge carries a five-year maximum term.

Pretrial Services found Fry a poor candidate for release and recommended against it; a magistrate judge agreed, and a district judge twice found that no condition or combination of conditions could assure defendant's appearance at his rapidly approaching September 7, 2016, trial. The court also found Fry posed a danger given his "volatility and unpredictability." (ER 2). The court's fact findings are well-supported by the record and its decision sound. The ruling should be affirmed.

1

## STANDARD OF REVIEW

The district court's fact findings are reviewed for clear error; this Court also conducts an independent review of the findings to determine whether the order may be upheld. *United States v. Fidler*, 419 F.3d 1026, 1029 (9th Cir. 2005).

## ARGUMENT

### The District Court Correctly Sized Up Defendant; Fry is Impulsive and Volatile and Poses an Insurmountable Risk of Danger and Non-Appearance at Trial.

The statute governing bail generally favors release, and doubts should be resolved in a defendant's favor. *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985). The government bears the burden of proving by a preponderance that a defendant is a flight risk; community danger requires proof by clear and convincing evidence. *United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015). Whether a defendant may be safely released on conditions requires that a court consider four factors: (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the nature and seriousness of the danger posed to the community; and (4) defendant's history and characteristics. 18 U.S.C. § 3142(g).

Even absent a statutory presumption, the facts underlying a particular crime may give rise to a supportable finding that a defendant poses a danger. For example, a defendant charged with fraud who made hostile and threatening statements to victims involved in a civil action was properly detained as a danger to the community.

2

*Fidler*, 419 F.3d at 1029. And even a first-time offender may pose a community danger given the nature of the charge and where the evidence against the defendant is strong. *See, e.g.*, *United States v. Hir*, 517 F.3d 1081, 1085-86 (9th Cir. 2008) (affirming detention in a presumption case for a defendant with no prior criminal history).

After expressly considering these statutory factors included within 3142(g), a magistrate judge and district judge concluded that Fry posed both a risk of nonappearance and a danger to the community. They were right.

First, there is no dispute that Fry was armed at the refuge. (ER 79). He appears on video stating, "I declare war against the federal government." (ER 72). Regardless of whether he brought a gun with him from home or whether he claimed a gun at the site, he was armed and he refused FBI entreaties to leave. The evidence against Fry is strong.

Next, there is also no dispute that Fry was suicidal during the final hours before his surrender. (Sealed Record at 8; ER 79). "If they're going to come in, you know I'll shoot myself before—they won't take me alive." (ER 48). That mindsight posed a significant threat to Fry and the officers and agents on the scene. Fry told the court at the release hearing that he "does have a history of some mental health issues. There's no question about that." (ER 77).

Fry also demonstrated his volatility when he escaped from a mental institution in 2009 by breaking down a door. (ER 9). And Fry has an eight-year history of

suicidal thoughts; thus, even though he may not pose an "imminent" suicide threat from the confines of his local jail cell, his history strongly suggests that the threat remains—particularly to any law enforcement officer he might encounter while on release as the district court found. (ER 85).

Moreover, Fry's admitted inability to handle stress is not adequately addressed by his proposed release conditions. He claims that living with his parents will provide stability, yet he still blames his father for his 2009 hospitalization, and he reports that neither parent understands him. His long history of marijuana use is his sole, preferred method to deal with his stress yet he fails to identify how he would cope on pretrial release given his acknowledgment that his marijuana use would be prohibited. (Sealed Record at 5; ER 77).

Fry was on probation from an Ohio state offense when he left the state to join the other occupiers at Malheur. Even though his probation was not revoked based on his activity at the refuge, defendant nevertheless conceded that "he's had some problems on supervision." (ER 17). Moreover, he is not a rancher and had no apparent interest in the concerns that brought the others to Burns, Oregon. Instead, Fry was attracted by the media attention and general anti-government sentiment. Leaving his home, his family, and his job to travel to Oregon to join an armed protest falls squarely within the court's description of him as impulsive and volatile.

Next, the amount of time between now and the September 7, 2016, trial date also favors continued detention. Defendant's release plan has him returning to Ohio, then traveling back to Oregon and returning to jail for the trial's duration. (ER 11). Defendant is stable in custody and reportedly doing well. A release for just five weeks threatens to disrupt that stability and produce more stress defendant is ill-suited to endure. As the district court observed: "In order to be prepared for trial, if you're back east, or middle west, it would be very difficult. I can't imagine how you could effectively communicate with your lawyer." (ER 21).

Finally, his examining psychologist suggests that if released he should limit social media postings, yet he is demonstrably unwilling to do that. After his unsuccessful bid for release before the district court, he posted yet another video on his Youtube channel personally attacking the judge and accusing him of being a "bigot, and a liar, a racist." (ER 23; David Speaks on Him being denied Pre-Trial Release (AGAIN), YouTube (July 14, 2016), http://www.youtube.com/watch?v= 7PhEl8QW3MU&sns=em (last visited on August 3, 2016)). This character slam mirrors Fry's criticism of a local police officer during a traffic stop in January of 2015.

The record squarely refutes any suggestion that Fry is amenable to direction from authorities; instead, he consistently chooses to lash out at authority figures by accusing them of either misunderstanding him, or worse by insisting that they are racists who want to "rape" him. In sum, the nature and circumstances of the charged

crimes and Fry's history and characteristics support the court's conclusion that Fry poses a danger to the public and a risk of non-appearance that cannot be ameliorated through conditioned release.

### Fry's Attacks on the District Court's Findings Should Be Rejected.

Initially, Fry isolates each of the court's findings in an effort to suggest that since no one factor justifies detention, the court must have erred. But governing law requires that the court examine all four statutory factors together. As a consequence, individual and apparent facial similarities between Fry and some of his co-defendants are entirely unpersuasive. Fry is a unique individual and the circumstances surrounding his actions and history demonstrate that he is one of those rare defendants who merits pretrial detention in a case with charges that do not involve a statutory presumption.

According to Fry, the "predominant reason" the district court denied release is because it "fundamentally misunderstood" his evidence. (Def. Mem. at 6). His support for that insulting assertion? Nothing.

His first specific claim that the district court clearly erred is that the court said that Fry feared an invasion from outer space, when in fact Fry claims that he has seen UFOs (several times). (Def. Mem. at 7; Sealed Record at 9). It is not clear from his brief how this distinction is material, but in any event, the court permitted Fry to respond to a summary of its specific concerns (ER 19-20), and Fry corrected the court

on that point. (ER 20). The judge told Fry, "I'll accept your clarification." (ER 21). And nothing in the record suggests that the court denied release based upon a misunderstanding regarding Fry's views about UFOs.

Next, Fry claims that the court misstated his views about reincarnation and his desire to return from the afterlife as a woman. (Def. Mem. at 7). Fry insists that these two ideas are distinct; although he sometimes wants to die, he is not at imminent risk for suicide, and he simply believes that if he were reincarnated, he hoped it would be as a female. (*Id.*; ER 20; Sealed Record 10). Again, it is not entirely clear how this distinction has any bearing on the court's release decision. Moreover, the court's remarks on this point are consistent with the Sealed Record (Sealed Record 10).

Finally, Fry argues that the district court mistakenly thought he had brought one of his father's guns with him to the refuge. (Def. Mem. at 10-11). But the court afforded Fry an opportunity to respond to its summary: "I said I'd like to make sure I have the facts right, and I'm willing to listen to you." (ER 19). There is, however, no dispute that Fry was armed while occupying the refuge. (ER 79).

Fry acknowledges that the district court correctly described his threat of "suicide by cop." (Def. Mem. at 8). But he claims that a recent jail report that describes him as "stable," along with an expert's prognosis that he is not presently an "imminent" risk for suicide constitutes proof that he could be safely released on

conditions. But Fry's evidence does not support a conditioned release for several reasons.

Even from the defense perspective, the expert's view is that Fry "does well when there aren't stressors around." (ER 11). When he is stressed, Fry "has reacted to that tremendous stress and it's gotten him in trouble." (ER 16). Pretrial release for just five weeks (by this point) and transport across the country are ripe for stress. The defense expert did not recommend release, expressly acknowledging that the question involved factors beyond Fry's mental health. (Sealed Record 13). Moreover, the defense expert's recommendations if Fry were to be released have not been addressed. (Sealed Record 15). Fry wants to live with his parents in Ohio, but he has no plan for ongoing counseling, he has failed to identify how he will treat his stress without marijuana, and he has given no sign that he will limit his social media access. Family support, standing alone, is not sufficient to address the court's concerns.

And the court's concerns were genuine and rooted in Fry's acknowledged inability to handle stress in a lawful manner that does not pose a danger to authorities: "You got into some—when you get into a tight situation, though, you can act out, and that concerns me a lot." (ER 59). The court also accurately determined that Fry is acutely vulnerable to stress given his history of poor impulse control. (ER 63-64). Fry's response to the court's comments at the conclusion of both hearings ("[y]ou're a bigot and a liar, a racist" ER 23; "I'm getting rashes by something, and I'm breaking

8

out from disease. I'm catching diseases by being here. It's not safe, Your Honor" ER 65), further support the district court's assessment.

Far from misunderstanding the evidence, the district court's appraisal of Fry was spot on.

## CONCLUSION

Defendant's motion for bail pending a trial scheduled to commence on September 7, 2016, should be denied.

DATED this 5th day of August 2016.

Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney
District of Oregon

*s/ Kelly A. Zusman*
KELLY A. ZUSMAN
Assistant U.S. Attorney